3/3/2020 1:36 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 41333983
By: Courtni Gilbert
Filed: 3/3/2020 1:36 PM

CAUSE NO. _____

| | | |
|---|---|---|
| ROOZBEH SHARIF AND | § | IN THE DISTRICT COURT |
| CHRISTINA SHARIF | § | |
| Plaintiffs, | § | |
| | § | |
| | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| CLEAR BLUE INSURANCE COMPANY, | § | |
| SWYFFT  LLC, and | § | |
| NORTH AMERICAN RISK SERVICES, INC. | § | |
| Defendants. | § | _____ JUDICIAL DISTRICT |

## PLAINTIFFS' ORIGINAL PETITION,
## REQUST FOR DISCLOSURE, AND JURY DEMAND

COME NOW PLAINTIFFS ROOZBEH SHARIF and CHRISTINA SHARIF (collectively "Plaintiffs" or "Sharifs") and file this their Original Petition, Request for Disclosure, and Jury Demand against DEFENDANTS CLEAR BLUE INSURANCE COMPANY, SWYFFT LLC, and NORTH AMERICAN RISK SERVICES, INC. (collectively "Defendants") and would respectfully show unto the Court as follows:

### SUMMARY OF CASE

1.      The Sharifs bought a Guaranteed Replacement Cost Homeowner's Insurance Policy from Clear Blue and Swyfft.  The Sharifs paid the premiums under their policy and otherwise honored their contractual obligations.  In the Summer of 2018, the Sharifs' house was damaged beyond repair. Aided by adjuster NARS, Insurers Clear Blue and Swyfft stubbornly and wrongfully refused to pay the Sharifs funds sufficient to replace or even repair the house. Instead, the Defendants spent the next 18 months dragging out the claims process through bad faith tactics in order to avoid paying the just amount due under the policy.  The claim remains unpaid.

### DISCOVERY PLAN

2.      Plaintiff intends for discovery to be conducted under Level 3 of Rule 190 of the

**EXHIBIT C**

Texas Rules of Civil Procedure.

**STATEMENT PURSUANT TO TEXAS RULE OF CIVIL PROCEDURE 47**

3.      Plaintiffs seeks monetary relief in an amount exceeding $1,000,000 as well as non-monetary relief. TEX. R. CIV. P. 47(c).

**PARTIES**

4.      Plaintiff Roozbeh Sharif is an individual resident of Harris County, Texas.

5.      Plaintiff Christina Sharif (formerly Christina Seguin) is an individual resident of Harris County, Texas.

6.      Defendant North American Risk Services, Inc.  ("NARS") is on information and belief a Delaware company registered to do business in the state of Texas. NARS does business in the State of Texas and did business in the State of Texas at all relevant times. NARS may be served by serving its registered agent Corporation Service Company D/B/A/ CSC-Lawyers Inc., 211 E. 7th Street, Suite 620, Austin, Texas 78701, or wherever they may be found.  Service of process on this Defendant is hereby requested.

7       Defendant Clear Blue Insurance Company ("Clear Blue") is on information and belief a Puerto Rico company with its headquarters located at B-7 Tabonuco Street, Suite 912, Guaynabo, Puerto Rico 00968.  Clear Blue is and was at all relevant times engaged in the business of insurance in this state. Clear Blue may be served with process by serving its registered agent Corporation Service Company, 211 E. 7th St. Ste. 620, Austin, Texas 78701 or wherever it may be found.  Service of process on this Defendant is hereby requested.

8.      Defendant Swyfft, LLC ("Swyfft") is on information and belief a New Jersey limited liability company having a principal place of business in New Jersey.  Defendant Swyfft does not maintain an agent for service of process in Texas, including as required by the Texas

2

**EXHIBIT C**

Insurance Code Section 804.013(b). Accordingly, Defendant Swyfft may be served with process by serving the Texas Commissioner of Insurance, Kent Sullivan, at 333 Guadalupe Street, Austin, Texas 78701, who may then forward process to Swyfft at its registered address, which is: Swyfft, LLC, 44 Headquarters Plaza Floor 4 Morristown, NJ 07960-3964, or wherever it may be found. Service of process on this Defendant is hereby requested.

## Jurisdiction and Venue

9.      This Court has subject-matter jurisdiction over this lawsuit because the amount in controversy exceeds the Court's minimum jurisdictional requirements. The Court has personal jurisdiction: (a) over Defendants Clear Blue and NARS because they are registered to do business in Texas as foreign companies; (b) over Defendants Clear Blue, NARS, and Swyfft because, though non-residents, they have purposefully availed themselves of the privileges and benefits of conducting business in Texas by continuously and systematically soliciting insurance business in Texas, conducting insurance business in the State of Texas, communicating with policy holders in the State of Texas, demanding and receiving policy premiums from Texas residents, insured real and personal property in the State of Texas, and sought the services of local Texas persons and entities in connection with the presentation, investigation, and adjustment of the claim made the basis of this case; (c) over all Defendants because each of the Defendants engaged in business in Texas by contracting with a Texas resident (i.e. Roozbeh Sharif and Christina Sharif).   Such contracts, which are more fully described below, were performed or to be performed in whole or in part in the Texas by the respective parties; and (d) further, each of the Defendants committed one or more torts made the subject of this lawsuit, in whole or in part in the state of Texas.

10.      Venue is proper in Harris County, Texas, because:

(a)      Harris County, Texas is the county in which the Defendants and their agents

**EXHIBIT C**

solicited the transaction that forms the basis of this suit.  *See* TEX. BUS. & COMM. CODE § 17.56;

(b)      all or a substantial part of the events giving rise to the lawsuit occurred in Harris County, Texas. *See* TEX. CIV. PRAC. & REM. CODE § 15.002(a)(2); and/or

(c)      Harris County, Texas is the county in which the Plaintiffs resided when their causes of action accrued.  TEX. CIV. PRAC. & REM. CODE § 15.002(a)(4).

<u>**Background Facts**</u>

11.      The Plaintiffs Dr. Roozbeh Sharif and Christina Sharif ("Sharifs") are a married couple. Plaintiff Dr. Roozbeh Sharif is a board-certified pulmonologist and internal medicine physician, who maintains a busy medical practice as Medical Director of the HCA Houston Healthcare Southeast Intensivist Group.  Plaintiff Christina Sharif (nee Seguin) is an occupational therapist employed by Houston Methodist Hospital with a Master of Science degree in occupational therapy.

12.      In early 2018 the Sharifs were engaged to be married (and were in fact married in November of 2019).  As most couples do, the two wished to start a family and, naturally, sought a house in a safe and pleasant neighborhood to start their lives together.  In the Spring of 2018, they began searching for a home where they could settle down and start a family.

***The Sunset Property***

13.      In early April of 2018, the Sharifs found the property at 1801 Sunset Boulevard in Houston, Texas ("Sunset Property").  The house on the Sunset Property was a two-story 2,259 square foot house built in 1938.  The house was the perfect size for a starter house and it had been kept in **very good condition** (according to the Harris County Appraisal District).  On April 6, 2018, the Sharifs signed a contract to purchase the property for $1,345,000.  Closing occurred on or about May 11, 2018.

**EXHIBIT C**

14.     Before purchasing the Sunset Property, the Sharifs—without doubt—did their due diligence.

15.     First, the Sharifs prudently hired Hedderman's Engineering Company, a reputable home inspection firm, to inspect the dwelling and undertake a structural and mechanical assessment of the dwelling.   On April 8, 2018, Hedderman Engineering sent a team under the direction of Tim Hedderman—a professional engineer registered with the State of Texas (License No. 51501)—to conduct the inspection of the Sunset Property.  Hedderman Engineering conducted an inspection and on April 12, 2018 issued a fifty-page report, signed by Tim Hedderman, to Sharif and Seguin.  The report showed that though the house needed certain relatively modest repairs that would be expected of an eighty-year old building, it had generally been well maintained, and there were no appreciable defects that stood in the way of purchasing or occupying the dwelling.

16.     Second, and going above and beyond the level of prudence exhibited by most buyers, Sharif and Seguin hired NationSpec Home Inspection to provide a comprehensive mold inspection of the house.  This inspection showed no evidence of mold in the house.

17.     Third, and in cooperation with their lender, Cadence Bank, the Sharifs had an appraisal report run on the property by licensed appraiser, Arthur David Brooks of David Brooks & Associates, Inc. of Houston, Texas.  Brooks found that the property was "**judged to be in good condition.**"  He further found that the "**home reflects an adequate, on-going maintenance program with no significant physical, functional or external inadequacies noted at the time of the property visit.**"  Brooks found that there were <u>no</u> "**physical deficiencies or adverse conditions of the property that affected its livability, soundness, or structural integrity.**"  In determining the "Replacement Cost New," of the dwelling, Brooks found that the "cost if new" value of the dwelling was $545,500, that the depreciated value of the dwelling was $272,750, and

**EXHIBIT C**

that the "as is" value of the site improvements was $40,000.

***The Policy***

18.     In April of 2018, Sharif and Seguin contracted with the Khansari Agency to obtain a homeowner's insurance policy on the Sunset Property. The Khansari Agency recommended obtaining a homeowner's policy from Defendant Swyfft.[1] On information and belief, Swyfft uses Clear Blue Insurance as its primary source of writing polices.

19.     The Khansari Agency applied for, and in fact obtained, a homeowner's policy through Swyfft (a managing general agency) and Clear Blue (which ultimately issued the policy) for the Sharifs.   At the Khansari Agency's recommendation, the Sharifs requested guaranteed replacement cost coverage for the dwelling on the Sunset Property with a limit of liability of $1.35 million.

20.     As is commonly known in the insurance field, a **guaranteed replacement cost policy:**

> pays the full cost of replacing the home even if this amount exceeds the policy limits. **This valuation method fully indemnifies the insured without any depreciation** and without a maximum reconstruction payment. The provision helps the insured avoid being underinsured in the event of a total loss. [emphasis added]"[2]

A guaranteed replacement cost insurance policy is an indemnity policy. It is intended to place the insured in the same position as the insured was *but for* the covered loss.

21.     Swyfft produced, and Clear Blue issued to the Sharifs, homeowner's insurance policy number AL01-052876-00 ("Clear Blue Policy") a true and correct copy of which is attached hereto as Exhibit "A" and incorporated by reference for all purposes herein.[3]   The Clear Blue

---

[1] On information and belief, Swyfft is not actually an insurance carrier (licensed or otherwise) but a managing general agency.   Managing general agencies control the branding, pricing, and claims experience of a policy, but another company provides the capital necessary to write the policy.

[2] *See* https://www.irmi.com/term/insurance-definitions/guaranteed-replacement-cost (website search).

[3] The Policy's Declarations sheet states that the "Company Name" is Clear Blue Insurance Company ("Clear Blue"),

**EXHIBIT C**

Policy was in effect from May 10, 2018 to May 10, 2019. The policy stated that "[w]e will provide the insurance described in this policy in return for the premium and compliance with all applicable policy provisions." *See* Exhibit "A" at p. 6. The total annual premium payment, which Sharif and Seguin paid, was $4,780.00. Jerome Breslin, President of Swyfft, and Maria Rodriguez, Corporate Secretary of Swyfft, executed the Clear Blue Policy on April 18, 2018. Among other coverage, the policy provided limits of liability of $540,000 in coverage for loss of personal property, $410,000 for loss of use, and (as stated above), $1,345,000 for loss to the dwelling.

22.     The Clear Blue Policy stated that the insurer covered "[t]he dwelling on the 'residence premises' shown in the Declarations, including structures attached to the dwelling." The "Residence Premises" shown in the Declarations page is given as 1801 Sunset Blvd., Houston, Texas  77005. *See* Exhibit "A" at p.6. In the policy, Clear Blue stated that "[w]e insure against direct physical loss to property described in Coverages A and B" i.e. to the dwelling and to other structures, respectively. Importantly, while the Clear Blue Policy provided certain exclusions from the kinds of losses for which Clear Blue insured, <u>none</u> of those exclusions applied when a loss arose from "an accidental discharge or overflow of water or steam from within a … plumbing, heating, [or] air conditioning  ... system … on the "residence premises." *See* Exhibit "A" at p. 17

***The Loss***

23.     The Sharifs moved in and occupied the house in June of 2018.

24.     In or about July and August of 2018, a malfunction in the HVAC system of the house caused substantial, though hidden, water leakage around the pipelines of the HVAC system. Unbeknownst to the Sharifs, this water leakage emanated to all parts of the house, causing the

---

and the Declarations sheet is signed by Clear Blue's executives. However, the Declarations sheet states that Swyfft, LLC is the "Producer," and the Declarations sheet bears the Swyfft mark. Therefore, Plaintiffs take the position that both Swyfft and Clear Blue are equally responsible for origination of the Policy, compliance with the terms of the Policy and are contractually bound by the Policy.

**EXHIBIT C**

water to saturate the foundation, walls, floors and other structures of the house. Parts of the house warped and buckled.  The house became infested with mold. On August 23, 2018, the Plaintiffs submitted a claim for this loss under the Clear Blue Policy.

### Defendants' Handling of the Claim

25.    Swyfft and Clear Blue acted through their third-party claims administrator, Defendant NARS, in adjusting the Sharifs' claim.  NARS acknowledged receipt of the Sharifs' claim on August 23, and notified the Sharifs that Andrea Gibbs had been assigned as Claims Adjuster.

### Damage to the Sharifs' House

26.    The Sharifs' house was damaged beyond repair, and this is borne out on the findings of multiple professionals and others who inspected the house.

### 1.    Olympia's First Inspection

27.    On August 27, 2018, NARS sent a field inspector (Marquel Matthews of Olympia Claims Services) to inspect the Sharifs' house.   Matthews issued his inspection report on September 2, 2018. [4]  Matthews verified the source of the problem in the house as the HVAC system.  Matthews also recorded and documented the "**extensive moisture**" penetration of the entire house.   Matthews estimated the actual cash value of the loss to the house as $46,174.71.

### 2.    Mold Inspection & Testing Inspection

28.    The Sharifs hired Mold Inspection & Testing ("MIT") to inspect the dwelling for mold. MIT's report indicated the presence of mold throughout the dwelling.   MIT reported that

---

[4] As an aside, in that report, Olympia wrote that "coverage was confirmed under the above policy number with effective dates of May 10, 2018 through May 10, 2019."More than a year later, Clear Blue and Swyfft would begin (speciously) arguing that coverage did not apply, despite Olympia's determination of September 2, 2018 that coverage applied and despite the fact that for more than a year from the date of submission of the Sharifs' claim, no one at Clear Blue, Swyfft, NARS or otherwise told the Sharifs that coverage did not or might not apply.

**EXHIBIT C**

"[i]t is our professional opinion that elevated mold conditions do exist at the property." MIT recommended professional mold remediation, and it observed "Water Damage," "excess humidity," and a "widespread problem."  MIT had Southeast Environmental Microbiology Laboratories run a Spore Trap Report for MIT in support of its investigation.  That report, dated August 24, 2018 and totaling 14 pages, indicated very high levels of mold—and in particular Aspergillus and Penicillium present in the house.  According to the report Aspergillus and Penicillium are allergenic fungi frequently found in problem buildings.  Some varieties of the two molds produce toxic substances, and both species may be associated with symptoms such as sinusitis, allergic bronchiopulmonary aspergillosis, other allergic symptoms,  mucous membrane irritation, headaches, vomiting, and diarrhea.

### 3.    **NARS' Instruction to Vacate House**

29.    On or about September 7, 2019, NARS adjuster Marybeth Verrengio contacted the Sharifs and instructed the Plaintiffs to hire a mold remediation company. Verrengio told the Sharifs to leave the house *immediately* due to the 'extreme' presence of mold in the house. Verrengio also informed the Sharifs that they were permitted to hire any firm of their choosing to perform mold remediation on the dwelling.

### 4.    **AGM's Estimate of $128,500 in Remediation Costs**

30.    Accordingly, and as instructed by NARS, on or about September 10, 2018, the Plaintiffs hired AGM Design Solutions ("AGM") to provide remediation services. AGM drafted and issued to Sharif and Seguin a six page proposal for remediation of the Sunset Property.  The proposed cost of remediation was $128,500.[5]  Dr. Sharif accepted this proposal on September 13,

---

[5] AGM ultimately (on October 16, 2018) estimated that rebuilding of the home would cost $870,000.  This is consistent with estimates put forward by Houston construction experts Ray Roberson of the Roberson Group and Jerid Colwell of Stonewall Constructors, but in marked contrast to the low-ball estimates consistently put forth by NARS.

**EXHIBIT C**

2018.

**5.**     **Mold Remediation Protocol and Inspection of Licensed Mold Remediation Consultant O'Halloran**

31.     Following prudent procedures, AGM ordered an independent Mold Remediation Protocol to be created by licensed mold remediation consultant Hansel O'Halloran. O'Halloran, in inspecting the Sunset Property, found that high humidity exhausting from the HVAC system caused standing water in the air ducts resulting in relative humidity in the house to rise above 60%. High humidity inside the residence caused mold growth and moisture to permeate into the drywall. O'Halloran found elevated moisture readings from 60s up to 90s percent throughout the house. He even found high humidity readings in the house's wood flooring, which had moisture readings of anywhere from 38% to 99% percent. O'Halloran recommended removing all built-in cabinets, drywall, ceiling, all wood flooring, the tub, vanity, the HVAC system, and "all contents" from the residence. AGM's remediation of the dwelling commenced and continued for the subsequent weeks. As a result of the extensive penetration of water and mold in the structure and of the recommended remediation process, all personal property was removed from the house and the house was completely gutted.

**6.**     **Olympia's Second Inspection**

32.     On or about October 31, 2019, Olympia (again through Marquel Matthews) performed a second inspection of the dwelling. In this inspection, Matthews noted that:

- he had "Confirmed moisture to [sic] multiple walls" and that a leak had started in the attic "due to [a] supply line"

- moisture levels in the walls of the Entry were at 100%[6]

- moisture levels in the mother in law room were variously between 71% and 100% and moisture had travelled down the wall and penetrated the wood floors, paint in the room had

---

[6] It should be noted that in determining whether moisture penetration of a dwelling's walls, floors or other structures is excessive, a typical cutoff is 17% moisture penetration.

**EXHIBIT C**

warped from moisture penetration

● moisture levels in the dining room were at 79%

● moisture levels in the walls of bathroom 1 were at 68%

● moisture levels in the walls of bathroom 2 were at 93%

● moisture levels in the walls of bathroom 3 were between 87% and 100%

● moisture levels in bedroom 2 were at 78% to 100%

● moisture levels in the living room were between 87% and 100%

● moisture levels in the upstairs office were at 100%

● moisture levels in the laundry room were at 75% to 94%

● "water leaking from the attic area has caused warping to the French door which is not closing properly."

In fact, Matthews noted that the only portion of the house that had not sustained *visible* damage was the stairway.

33.     Basically, Matthews' report acknowledged that the house was saturated with water, and was still saturated *two months* after the HVAC system had malfunctioned.   Matthews then found that the actual cash value of the loss to the Sunset Property was $140,741.29.[7] This amount, though vastly understating the loss, contrasted starkly with the estimate of loss made only a few months before by the same inspector.   Therefore, on re-inspection, Olympia *tripled* the amount of the projected loss to the house, which begs the question of whether one can ever rely on Olympia's estimates.

**7.     <u>Paul & Davis Inspection</u>**

34.     On November 15, 2018, Dan Coll from Paul & Davis—which was hired by

---

[7] It should be noted that, importantly and in finding this, Matthews did *not* contend (as NARS later speciously did) that *AGM* had caused the damage to the dwelling in an after-the-fact effort to absolve Clear Blue and Swyfft of liability to pay the claim.

**EXHIBIT C**

NARS—inspected the house on the Sunset Property.  Paul & Davis did not issue its inspection report for nearly four months—that is, until March of 2019. Paul & Davis ultimately found that the amount needed to repair the house was nearly $282,000—an amount that was seven times the amount that Olympia first reported to NARS, and double Olympia's revised estimate of October 2018.  Again, these highly divergent estimates beg the question of who among NARS' various adjusters and inspectors could be trusted to adjust the loss correctly.  In any case, NARS apparently rejected the Paul & Davis report and recommendation because at no time did NARS ever offer the Sharifs anything close to the amount Paul & Davis found necessary to repair the house.

**8.    Inspection by Professional Engineer Tim Hedderman**

35.    In early December of 2018, the Sharifs again hired Tim Hedderman of Hedderman Engineering.  Hedderman personally inspected the Sunset Property, and he issued a report of his inspection on December 10, 2018.  Hedderman found that the malfunction of the HVAC system had caused significant damages to the house—so much damage that structural integrity of the house was in question.  Hedderman insinuated that the extent of the loss was so great that the repair cost would amount to a substantial portion of the value of the house itself.

36.    More specifically, in his December 10, 2018 report, Hedderman explained that he inspected the foundation of the house and compared it to the original (pre-loss) Hedderman inspection of April 12, 2018. In the December 10 report, Hedderman wrote:

> In comparing these current elevation readings with the previous set of readings taken during our previous inspection on April 12, 2018, and [sic] **the foundation has changed significantly since our previous inspection,** particularly at the add-on areas including the sun room and the game room.  The sloping of the floor in the sun room has increased and now slopes down 2.3 inches across the width of the room as compared to 1.6 inches previously.  Also, the **door frame** from the sun room the rear of the house was **visibly wracked out of square** due to the movement of the foundation.  **We also observed that the elevation readings of the game room … have changed significantly since our previous inspection**.  The floor now slopes downward 1.2 inches from the front of the room towards the rear of the

**EXHIBIT C**

room, whereas before the floor sloped .9 inch [sic] from the rear towards the front. Also, **the concrete floor has a large crack and separation at the joint between the slab on grade and the house foundation.**

37.     Hedderman continued stating that "[d]ue to the damage, the house will require very extensive repairs to bring the house into compliance with current codes.  Hedderman found that original piping must be removed, wiring must be brought to current standards, including obsolete underground knob and tube wiring. He found that all wiring must be removed from walls, floors, ceiling, crawlspace, and other structures.  He found that there was (possibly) asbestos containing material in wrappings of the HVAC ductwork that might require remediation, that there was HVAC equipment that needed to be removed, and that all old duct work must be replaced. Hedderman concluded by writing:

> Based on our observations of the condition of the structural components of the house, it is our opinion that [] extensive repairs needed to the house to bring it into conformity with current code requirements" and that these repairs "can amount to approximately 75% of the value of the house." He further concluded that "due to the extensive cracking and damage to the foundation of both the original house and the add-on areas, the long term structural integrity of the foundation is in question."

**9.     Roberson Group Inspection**

38.     As NARS had become not only totally unhelpful, but now openly hostile to the Sharifs, the Sharifs consulted Roberson Building Group, LLC ("Roberson Group"), a well-respected Houston home builder for advice in determining the best course of action with respect to repairing or replacing the dwelling. The Roberson Group inspected the house. In a March 4, 2019 letter to the Plaintiffs, the Roberson Group determined what all of the sensible professionals, as well as the lay people, knew—the house was a total loss and needed to be replaced.   The Roberson Group wrote:

> "Upon inspection of [the Sunset Property] Roberson Building Group has concluded that we would advise against repairing the damage to your home. The

13

**EXHIBIT C**

damage that has occurred to the residence will require substantial foundation repair, structural framing repairs, mold remediation, removal of potential asbestos containing materials, replacing exterior cladding, replacing doors and windows, roofing repair, and replacing all mechanical systems in the home. Due to the extent of the damage and the cost associated with repairing what is left of the structure it is our professional opinion that demolishing what is left of the home and rebuilding a new structure is the best course of action."

**10.**    **Brubaker Inspection and Appraisal of House as Total Loss**

39.    The Sharifs obtained the opinion of real property valuation appraiser, Mike Brubaker, a well-respected Houston residential property appraiser.   Brubaker evaluated the property pre-loss and post-loss, and found that the dwelling, which had a pre-loss value of $100,000, was a **total loss and worth nothing due to the dwelling's HVAC problems.**

**11.**    **Jerid Colwell/Stonewall Constructors Inspection**

40.    Further, the Sharifs obtained the opinion of Jerid Colwell of Stonewall Constructors, another well-respected Houston custom home builder.   Colwell found that the amount of loss was $870,260 if the house were to be repaired [coincidentally this was virtually the same amount as AGM had estimated months previously], and that a replacement of the house would cost between $787,351.58 and $825,250.69. In concluding his Appraisal report, Colwell wrote that "we feel that the most cost and time effective solution is to raze the remaining structure and build a new home."

***Defendants' Violations of Law, Bad Acts, Omissions, and Bad Faith***

41.    The overwhelming data and the consensus of the multiple experts cited above— which included a professional engineer, residential building experts, mold inspectors, and a real estate appraiser, and NARS' own inspectors, was that the house was water logged, warped, structurally unsound, extensively damaged, and if not a complete and total loss, then in need of extensive repair that would cost almost as much as the remaining value of the structure.

14

**EXHIBIT C**

42.     In the weeks and months after they submitted their claim, the Sharifs kept in constant contact with NARS, Clear Blue, making frequent submission of information and request for responses and information.   The Sharifs, who were in almost daily contact with NARS and the insurers and who provided reams of written information and reports to NARS and the insurers, provided significantly more cooperation, help, and assistance in the claim process than would even the most diligent of insureds.

43.     This begs the questions:

● **Why, a year and a half after the date of loss, is this claim not settled?**

● **Why are the Sharifs still living out of a suitcase?**

● **Why is house on the Sunset Property still a gutted, empty shell?**

● **Why have the Defendants not kept their word and replaced the residence, tendered sufficient funds to effect a proper repair, or even provided a final statement of loss to the Sharifs?**

44.     This is the answer:  Clear Blue and Swyfft **never intended to pay even a fair amount on the claim**.   NARS never intended to fairly or honestly adjust the claim.   The Defendants **never intended to honor their word** or the terms of the policy.  The Khansari Agency generated and sold, and all Defendants were paid by the insured for, an insurance policy they would never really honor.  NARS, Swyfft, and Clear Blue were determined to delay and drag the claim out until the Sharifs capitulated and accepted a pittance instead of the rightful amount due under the policy.  In sum, the Defendants acted in violation of the laws of the State of Texas, in bad faith, or worse.

45.     How did Clear Blue, Swyfft, and NARS carry out their plan?

46.     Clear Blue, Swyfft (directly and by and through NARS and each other) and NARS itself were unresponsive and absent.  NARS was unresponsive, often going 'dark' for days and

**EXHIBIT C**

weeks at a time.  This occurred throughout the pendency of the claim, from the begging, in the middle, and continues to the present.  For example, throughout the months of April and May of 2019, the Sharifs repeatedly attempted to contact Clear Blue regarding their claim, but neither Clear Blue nor any of its agents or proxies, such as NARS, responded.   It was not until late May of 2019, that NARS or Clear Blue resurfaced.  NARS then asserted that the parties could not agree on an amount of loss, which was not true because NARS had never given the Sharifs a formal statement of loss or otherwise taken a position as to what Clear Blue would pay on the Sharifs' claim.  NARS then demanded an appraisal of loss as provided under the Clear Blue Policy.  Put more globally, the Defendants used a ridiculously long investigation and a pretext for not paying the Sharifs' claim.

47.     The Defendants churned the claim through five different adjusters, none of whom were properly trained, competent, or willing to properly adjust the claim or settle it.

48.     The Defendants disregarded the recommendations of their own inspectors and experts.  Instead, they relied on reports prepared by persons, such as EFI, whom they knew were not objective in investigating the Sharifs' loss.

49.     The Defendants disregarded the recommendations and reports of third-party inspectors and experts attempting in good faith to aid the claim process.

50.     The Defendants failed to follow through with promises and representations, for example, promising that the claim would be settled within two weeks and then failing to effectuate a settlement, promising to send written statements of loss and then failing utterly to do so, promising to make payments on the claim within days and then taking weeks to do so (or never paying as promised).  For example, on or about November 1, 2018, NARS assigned a new adjuster, Brian Sims, to the claim. Sims told the Sharifs that NARS would handle their claim in a timely

**EXHIBIT C**

fashion, and that all needed work on the claim would be completed in two weeks' time. Obviously this did not happen.  Similarly, on April 4, 2019, a *fifth* NARS adjuster—Jonathan Weedman once again falsely promised the Sharifs a quick resolution and prompt payment of their claim.  Ten months later, no resolution has occurred and the Defendants have not paid the vast bulk of the claim.

51.    In retaliation for the Sharifs' good faith efforts to press their claim, the Defendants terminated the Sharifs' homeowners' policy on short notice and without cause;

52.    The Defendants sowed confusion and generally were incompetent in proper management of the claims process, sending out inspectors from time to time who varied widely in their estimate of the loss, who ignored critical data that was important to adjusting the loss, and the Defendants failed to send competent inspectors and adjusters in a timely manner.

53.    They adopted conclusory and unfounded rationales for denying payment and/or delaying the Sharifs' claim, including by accepting the report of inspector EFI made without scientific or practical basis, by failing to follow up with important leads and sources in investigation of the claim, and by failing to take and preserve important evidence that might have assisted the claim.

54.    They requested and instituted an appraisal of loss process in an untimely manner, in contravention of the law, in a manner that was so delayed as to be prejudicial to the Sharifs' best interests, solely in order to drag the claim process out and without any intention of attempting in good faith to adjust, appraise or estimate the claim properly or in good faith and with a predetermined and preconceived plan to refuse to consider any evidence or appraisal brought forth by the Sharifs.

55.    They manifested bad faith toward the Sharifs in using false and misleading

**EXHIBIT C**

information against the Sharifs and in inventing 'after the fact' rationales for refusing payment or proper settlement of the claim. For example:

a.      in a September 27, 2018 email to the Sharifs, NARS' adjuster Marybeth Verrengio attempted to blame the widespread presence of mold in the house on Hurricane Harvey—a storm which not only had occurred thirteen months before, but one which demonstrably did not cause mold growth in the house given that mold inspections done before the May 2018 closing on the house revealed no mold problems at all.

b.      Likewise, in February of 2019, and six months after the Sharifs submitted their claim, NARS began taking the specious position (based on a December 21, 2018 report of NARS' third inspector, EFI Global Engineering) that the damage to the dwelling's foundation was pre-existing and unconnected to the water that had emanated from the HVAC system. This position was of course directly refuted by the two reports of Hedderman Engineering—which, in contrast to EFI, had actually been present in the dwelling both before and after the loss.  NARS thus began taking a position that was hostile to the Sharifs.

c.      Later, in the Fall of 2019, the Defendants began taking the unbelievable position that there might be a 'coverage issue' with the Sharifs claim when (a) the claim was already more than a year old, (b) they had never mentioned such a problem before, (c) the policy clearly provided coverage, and (d) their own inspector (Matthews) acknowledged that coverage applied.

d.      They fabricated a rationale for refusing settlement of the claim out of whole cloth:  that it was all AGM's fault.  Again, a year after the claim was filed, the Defendants began to claim that all or some of the damage to the Sharifs' house was caused by AGM gutting the property, when (a) the Defendants knew that AGM was planning on gutting the property, (b) the

**EXHIBIT C**

Defendants later ratified such acts by paying and approving some of AGM's bills, and (c) the Defendants acknowledged the necessity of extensive remediation expressly or by implication by instructing the Sharifs to hire their own remediation company and by telling the Sharifs to vacate the property because of dangerous levels of mold.

56.     After NARS implied that the Insurer Defendants were subrogated to the Sharifs' claims against third parties, the Sharifs asked NARS to verify whether Clear Blue or any other party claimed to have been subrogated to the injuries alleged by the Sharifs in their Claim, so that the Sharifs could pursue such claims independently and in a timely and effectively manner, NARS (and through NARS, Clear Blue and Swyfft) failed to acknowledge this one way or the other, thus depriving the Sharifs of their ability to recover independently of their claim if at all possible, or in the least diminishing and hampering their ability so to recover.

57.     NARS dragged its feet on the claim so badly, AGM, an important player in remediating the residence, walked off the job.  On or about October 30, 2018, AGM ceased remediation work on the Sunset Property because, on information and belief, NARS had failed to communicate with AGM and failed to make payments in order for AGM to complete the remediation process. Due to AGM ceasing work on the Sunset Property, the remediation process was never completed and Plaintiffs never received a "passed" clearance test from AGM.

58.     They intentionally used tools intended to produce a low-ball estimate of the cost of repair.  Clear Blue's appraiser responded only with a regurgitated Xactimate software repair cost estimate, using basically the same data given almost a year earlier by Olympia.  As is well known in the insurance filed, Xactimate was developed by the insurance carriers through their subsidiaries Xactware and Verisk Analytics. The software is notoriously untrustworthy and is used to generate

19

**EXHIBIT C**

low-ball repair estimates.  According to one commentator[8]:

> There is growing contention in the industry that the pricing structure and estimating features in Xactimate favor the insurers and are adjuster-centric, leaving contractors' concerns and needs by the wayside. There is also the argument that since Xactware is now owned by Verisk, which is a data analytics and risk assessment firm in the insurance industry, they favor the insurer's needs over the contractor's.

59.     The Defendants intentionally and willfully ignored the common sense, eminently visible, and plain fact that the residence is a total loss and total ruin and must be replaced, something that would be visible even to a child.  **The Defendants fought much harder to deny the claim than to understand the claim.**

60.     When given a concrete and clear demand for payment of the claim and a demanded amount to settle the claim, all within the policy limits of the Clear Blue Policy, in November of 2019 by the Sharifs, the Defendants requested time to investigate and on information and belief, did nothing or virtually nothing to investigate and instead used the pretext of investigation as another means of delaying payment.

61.     **Eighteen months** have passed and the claim has still not been resolved.  Eighteen months in which their insureds have been without their home and their personal effects.  This is an inexcusable shame.

*The Sharifs' Damages are Extensive*

62.     Plaintiffs requested that Defendants Clear Blue and Swyfft cover the cost of repairs or replacement cost of the Sunset Property, including but not limited to repair or replacement of the interior damage to the property and repair or replacement of the personal property, pursuant to the Policy. Plaintiffs made the claim believing that benefits for those losses would be paid pursuant

---

[8] *See* Restoration and Remediation Magazine Online, "Pricing, Estimates, & the Bottom Line," Alena Wilson, September 7, 2017, found at https://www.randrmagonline.com/articles/87592-pricing-estimates-the-bottom-line.

**EXHIBIT C**

to the Policy for which Defendants Clear Blue and Swyfft have represented to Plaintiffs as providing full insurance coverage for all perils, including the guaranteed replacement cost. The Plaintiffs have, on multiple occasions, requested information regarding Clear Blue's adjustment of the loss, intended coverage and/or Clear Blue's general intent with respect to the Claim, but Clear Blue refuses and fails to answer.  Eighteen months have passed, during which the Sharifs have been dispossessed of their home, living in temporary housing, and bereft of their personal belongings. Their mental anguish is appreciable, palpable, and understandable under these circumstances.  Anyone in the Sharifs' position would be irate with their insurer under the same or similar circumstances.  The Sharifs have shown remarkable restraint despite the ordeal to which Clear Blue, their own insurer, has subjected them.

63.     To date, Clear Blue has neither provided a final adjustment or statement of intent to pay under the policy, nor has it paid for the loss to the dwelling. From the sum total of the circumstances, one can only deduce that this conduct has been intentional, willful and malicious, and that Clear Blue never had an intent to abide by the Clear Blue Policy or to indemnify the Sharifs as the policy mandated.

64.     The Plaintiffs' home is now ruined, gutted, and uninhabitable.  It has been found to be saturated with water, mold infested, and structurally unsound.  It has been inspected and re-inspected by multiple independent professionals who universally recommend demolition and replacement of the home.  It has been found to have been subjected to extensive structural damage and to be a total loss and worthless, or virtually worthless, by engineers, construction professionals, real estate appraisers, the Harris County Appraisal District, and others.   Yet the Defendants stubbornly, and in the face of all reasonable and reliable evidence, refuse.

65.     The Defendants' intransigence, their bad faith, this refusal to keep their

**EXHIBIT C**

commitments by settling the claim and paying under the policy, have cost the Sharifs dearly.

66.     As a consequence of Clear Blue's acts and/or omissions, described above, the Sharifs have suffered severe actual damages, including the loss of their home which has neither been replaced nor repaired, costs attributable to the lost dwelling, costs associated with obtaining substitute housing, lost contents and personal property, expenses related to mitigation and remediation of the dwelling, attorney fees, and court costs, in a total amount of no less than $1,894,260 and possibly more as injury continues to accrue, to be proved at or before trial, and more fully described as follows:

(1)     The estimated amount necessary to replace the dwelling:     which is at least $825,250.69, or alternately, to repair the dwelling, which is at least $870,260;

(2)     Reimbursement for costs and expenses associated with the loss, totaling $150,000;

(3)     Rental fee for alternate housing, $5,000 per month for 24 months, totaling $120,000;

(4)     Fees needed to conduct repeat inspections and appraisal, legal fees and costs of court expended in order to achieve fair processing of this claim, estimated to total at least $50,000;

(5)     Lost profits, income, salary, and wages incurred as a result of being de-housed and uprooted and with managing the claims process in an amount of at least $200,000;

(6)     Premiums paid in an amount exceeding $4,000 for a policy of insurance for which the Sharifs were not given the value; and

(7)     Mental anguish to each of the Plaintiffs in an amount of at least $250,000 incurred by each of the Sharifs.

***Post-Script: Why have the Defendants dishonored their Policy Obligations?***

67.     At this point, a word regarding motive is warranted.

68.     The use of the $1.345 million amount provided by Swyfft and Clear Blue for the dwelling policy limits in the Clear Blue Policy raises interesting questions, the answers to which may explain why the Defendants have refused in bad faith to pay the Sharifs claim in this case.

**EXHIBIT C**

$1,345,000 was obviously the overall purchase price for the Sunset Property paid by the Sharifs as reflected in the sales contract for the Sunset Property—but that amount overwhelmingly was attributable to the *land* value of the Sunset Property and this fact was public knowledge and readily discerned from public sources.  The dwelling on the property was variously estimated as having a value of at approximately half a million dollars in the least, and Swyfft and Clear Blue knew this because, prior to issuance of the policy, they had access to the appraisal of David Brooks, described, above.  Was there a problem in the underwriting process?  Both Swyfft and Clear Blue are essentially novices in the insurance industry. The Swyfft business model relies on insuring real property quickly and with a bare minimum of underwriting and research, using aggregate data, algorithms and satellite pictures (claims Swyfft).  Swyfft does not rely on the usual questions homeowner's insurance underwriters ask.  Presumably this means that Swyfft's ideal home to insure is one that fits the usual parameters of age, condition, location, and value in relation to the neighborhood—not necessarily the case with the Sunset Property.  Why then did Swyfft and Clear Blue issue this policy to the Sharifs in the way they did if they had no intention of honoring their obligations in the policy as written?  As of now, the Sharifs do not know, but for whatever reason, Clear Blue and Swyff did in fact issue the policy. Any problem in the underwriting process does not excuse Swyfft and Clear Blue from doing what they gave their word to do—paying on the loss.

69.     But what the Sharifs do know is this:  the only reasonable explanation for the blatant refusal of the Insurers to honor the insurance policy and of NARS' intransigent behavior in abetting that refusal is that *though the extent of the loss to the Sunset Property is plain as day* for whatever reason, NARS, Clear Blue and Swyfft *never* had an intention to pay for a covered loss on the policy, and instead decided to draw out the adjustment process for so long that the insureds would just give up and go away.

**EXHIBIT C**

## Causes of Action

70.    _**Vicarious Liability**_:  With respect to all claims and causes of action brought herein, Plaintiff's plead that: (a) non-party Khansari Agency and its representatives employees and agents ("Khansari Agency") are insurance agents pursuant to Texas Insurance Code Section 4001.003(1) because they solicit, negotiate, procure or collect premiums on insurance, (b) Swyfft is also an insurance agent, in particular as to Clear Blue, because it solicits, negotiates, procures or collects premiums on insurance, (c) whether through joint venture, joint enterprise, or general partnership, Swyfft and Clear Blue are both party to the Clear Blue Policy issued to the Sharifs and thus are jointly and severally liable for any breach of such policy, or violation of the law with respect to such policy, or any act or omission described herein that caused harm to the Sharifs, (d) NARS was acting at all relevant times as agent for Swyfft and Clear Blue; and thus Clear Blue and Swyfft are vicariously liable for any act or omission of NARS and non-party the Khansari Agency, (e) the Khansari Agency was acting at all relevant times as agent and/or sub-agent for Clear Blue and Swyfft, (f) to the extent that it independently violated a legal, contractual, common law, or other duty independently owed to the Sharifs or others, as described herein, NARS is independently and jointly and severally liable to the Sharifs along with Clear Blue and Swyfft, and (g) generally, wherever an agent's act is described herein, such act is and should be treated as the act of the principle or principles for whom the act was undertaken, consistent with Texas Insurance Code Section 4001.05(b).

### Count I
### Bad Faith

71.    The pleadings and allegations of Sections 11 through 69, above, are incorporated fully herein by reference and for all purposes.  This count is brought against Defendants Clear Blue and Swyfft only.

**EXHIBIT C**

72.     The Clear Blue Policy was an insurance contract between the Sharifs, as insureds, and Clear Blue and Swyfft as insurers.  The Clear Blue Policy gave rise to a duty of good faith and fair dealing on the part of Clear Blue and Swyfft. Clear Blue and Swyfft owed this duty to the Sharifs.

73.     Clear Blue and Swyfft breached their duties of good faith and fair dealing when they denied and/or delayed payment on the Sharifs' claim arising from the August 2018 loss when liability was reasonably clear or when Swyfft and Clear Blue knew or should have known that liability was reasonably clear, as more fully set forth, above.  Clear Blue and Swyfft's breach proximately caused damages to the Sharifs as described under the "Damages" section, above, and in amount to be proved at or before trial, but in no case less than $1,894,260.

74.     The conduct of Clear Blue and Swyfft that was in bad faith, as described, above, was fraudulent, malicious, intentional and/or grossly negligent.  Further, the Sharifs have pleaded for, and indeed can, recover for injuries independent of the loss of policy benefits.  Therefore, the Sharifs request and the Court may award an award of exemplary damages against Clear Blue and Swyfft.

**Count II**
**Deceptive Insurance Practices in violation of Section 541 of the Texas Insurance Code**

75.     The pleadings and allegations of Sections 11 through 69, above, are incorporated fully herein by reference and for all purposes.  This count is brought against all Defendants.

76.     The Sharifs and the Defendants are "persons" as defined by Texas Insurance Code Section 541.002(2).  NARS is liable as a defendant both as an agent and as an independent claims adjuster of Clear Blue and Swyfft.  The Defendants engaged in acts and practices that violated: (a) Texas Insurance Code chapter 541, subchapter B, and (b)   Texas Business & Commerce Code §17.46(b) as described under Count IV, below, and the Sharifs relied on the acts and practices to

25

**EXHIBIT C**

their detriment.

77. The Defendants violated Texas Insurance Code Section 541.051 by making, issuing, circulating or causing to be made, issued, or circulated any estimate, illustration, circular, or statement misrepresenting: (1) the terms of the policy and (2) the benefits or advantages promised by the policy. *See* TEX. INS. CODE § 541.051(1)(A) and (B), respectively. Further, the Defendants misrepresented the nature of the policy through its name or title by declaring the policy to be a Guaranteed Replacement Cost policy, including in the endorsements and declaration sheet of the policy, when they had no intention to treat the policy as a guaranteed replacement cost policy. *See* TEX. INS. CODE § 541.051(4).

78. The Defendants violated Texas Insurance Code Section 541.061 by:

a. making an untrue statement of material fact. *See* TEX. INS. CODE § 541.061(1);

b. leaving out a material fact so that other statements are rendered misleading; *See Id.* at § 541.061(2);

c. Making a statement in a way that would lead a reasonably prudent person to a false conclusion about a material fact. *See Id.* At § 541.061(3); and

d. Not disclosing any matter required by law to be disclosed. *See Id.* At § 541.061(5).

79. Clear Blue, Swyfft and NARS violated Texas Insurance Code Section 541.060 by:

a. Misrepresenting to the Sharifs, who were claimants, a material fact or policy provision relating to the coverage at issue. *See* TEX. INS. CODE § 541.051.060(a)(1);

b. Not attempting in good faith to bring about a prompt, fair, and equitable settlement of a claim once the insurer's liability became reasonable clear. *See* TEX. INS. CODE §

**EXHIBIT C**

541.060(a)(2)(A);

        c.      Attempting to pressure the claimant to settle a claim under one portion of the coverage by refusing to bring about a prompt, fair, and equitable settlement under another portion of the coverage, once Clear Blue and Swyfft's liability on the other portion of the coverage became reasonable clear. *See* TEX. INS. CODE § 541.051.060(a)(2)(B), in this case by terminating or attempting to terminate the Sharifs housing coverage in order to pressure them to settle on losses to the dwelling and/or personal property;

        d.      Not promptly giving a policyholder a reasonable explanation, based on the policy as it relates to the fact or applicable law, for the insurers denial of a claim or for the offer of a compromise or settlement of the claim. *See Id.* at § 541. 060(a)(3);

        e.      Not completing within a reasonable time (1) affirming or denying coverage of a claim to the Sharifs as policyholders. *See Id.* at § 541.051.060(a)(4)(A); and (2)  submitting a reservation of rights to a policyholder. *See Id.* at § 541.060(a)(4)(B);

        f.      Refusing, failing to make, or unreasonably delaying an offer of settlement under applicable first-party coverage on the basis that other coverage may be available or that third parties are responsible for the damages suffered. *See Id.* at § 541.060(a)(5); and

        g.      refusing to pay a claim without conducting a reasonable investigation. *See Id.* at § 541.060(a)(7).

80.      The Defendants acted knowingly in carrying out these acts, omissions, practices and violations, and such acts, omissions, practices and violations, were producing and proximate causes of the Sharifs' damages, which are more fully described under the "Damages" Section, above. Further, and because the Defendants acted knowingly, the Sharifs are entitled to additional damages as allowed by Section 541.152(b) of the Texas Insurance Code and hereby request an

**EXHIBIT C**

award of such damages in an amount that is three times the amount of actual damages, in addition to actual damages.  Further, the Sharifs request an award of reasonable and necessary attorney fees pursuant to for the Defendants' violation of Section 541 of the Texas Insurance Code.

## Count III
## Late Payment of Claims under Texas Insurance Code Chapter 542

81.     The pleadings and allegations of Sections 11 through 69, above, are incorporated fully herein by reference and for all purposes.  This count is brought against Defendants Swyfft, Clear Blue, and NARS.

82.     The Sharifs had a claim arising from the loss to their dwelling that occurred in August 2018 under their Clear Blue Policy.  The Sharifs gave proper notice of their claim to Swyfft and Clear Blue (including by and through NARS), first on August 23, 2018 and then in an extensive and continuous manner thereafter.  Clear Blue and Swyfft are liable for payment of the Sharifs' claim as demonstrated, above.

83.     Swyfft and Clear Blue (including by and through NARS) violated Texas Insurance Code Chapter 542 by not timely (1) acknowledging, investigating, and/or requesting information about the claim, (2) accepting, rejecting or extending the deadline for deciding the claim, and (3) paying the claim.

84.     Swyfft and Clear Blue's violations of Chapter 542 of the Texas Insurance Code have proximately caused injury to the Sharifs, for which the Sharifs request an award of damages. Such damages include the amount of the claim, as described under the "Damages" section, above. Further, the Sharifs are entitled to interest on their claim as statutory damages provided under Texas Insurance Code Section 542.060(a).

## Count IV
## Violations of the Texas Deceptive Trade Practices Act

**EXHIBIT C**

85.     The pleadings and allegations of Sections 11 through 69, above, are incorporated fully herein by reference and for all purposes.  This count is brought under the Texas Deceptive Trade Practices Act, Chapter 17 of the Texas Business & Commerce Code ("Texas DTPA"). This count is brought against Defendants Clear Blue, NARS, and Swyfft.

86.     As more fully described, above, the Sharifs are and were at all relevant times consumers, having sought or acquired goods and/or services from Defendants Clear Blue, NARS, and Swyfft, each of whom may be sued under the Texas Deceptive Trade Practices Act. As more fully described under the Background Facts Section, above, the Defendants violated the Texas DTPA by committing false, misleading, or deceptive acts enumerated under Texas Business & Commerce Code § 17.46(b), all of which the Sharifs relied on to their detriment, as follows:

(1)     Causing confusion or misunderstanding about the source, sponsorship, approval, or certification of goods or services. *See* TEX. BUS. & COM. CODE § 17.46(b)(2).

(2)     Causing confusion or misunderstanding about affiliation, connection, or association with, or certification by another. *See* TEX. BUS. & COM. CODE § 17.46(b)(3).

(3)     representing services as of a particular standard, quality, or grade when they were not.  *See* TEX. BUS. & COM. CODE § 17.46(b)(7).

(4)     representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have.  *See* TEX. BUS. & COM. CODE § 17.46(b)(5).

(5)      advertising services with intent not to sell them as advertised.  *See* TEX. BUS. & COM. CODE § 17.46(b)(9).

(6)     representing that an agreement (i.e. the Clear Blue Policy) confers or involves rights, remedies, or obligations which it does not have or involve. *See* TEX. BUS. & COM. CODE §

**EXHIBIT C**

17.46(b)(12).

(7)   failing to disclose information concerning the Defendants' services which was known at the time of the transaction intending to induce the Sharifs into purchasing the Clear Blue Policy, which the Sharifs would have not done had the relevant information been disclosed. *See* TEX. BUS. & COM. CODE § 17.46(b)(24).

87.   Further, the Defendants' acts and omissions described under the Background Facts Section, above, constituted unconscionable actions and an unconscionable course of action. *See* TEX. BUS. & COM. CODE § 17.50(a)(3).

88.   Further, the Defendants conduct as described under the Background Fact Section and under Counts I and II, above, constituted violations of Chapter 541 of the Texas Insurance Code, which acts and omissions are classified as false, misleading, and deceptive acts and practices. *See* TEX. BUS. & COM. CODE § 17.50(h).

89.   These violations, breaches, and wrongful acts were producing causes of the Sharifs' damages described under the Damages Section, above. Accordingly, and as a result of the Defendants' various Texas DTPA violations, the Sharifs are entitled to economic damages, which include the amount of their benefits wrongly withheld.  In undertaking these acts, the Defendants acted knowingly and intentionally, and therefore the Sharifs are entitled to damages for mental anguish.  The Sharifs are also entitled to, and hereby request, an award of additional damages that is three times their economic damages pursuant to Section 17.50(b)(1) of the Texas DTPA. Plaintiffs are also entitled to and hereby request an award of court costs and attorney's fees. TEX. BUS. & COM. CODE § 17.50(d).

**Count V**
**Breach of Insurance Contract against Swyfft and Clear Blue**

90.   The pleadings and allegations of Sections 11 through 69, above, are incorporated

**EXHIBIT C**

fully herein by reference and for all purposes.  This count is brought against Defendant's Clear Blue and Swyfft.

91.     The Clear Blue Policy, a homeowner's guaranteed replacement cost insurance policy, was a contract between the Sharifs on one hand, as insureds, and Swyfft and Clear Blue, on the other, as insurers.  The Sharifs paid premiums to Clear Blue and Swyfft and otherwise performed their obligations under the Clear Blue Policy.

92.     In or about August of 2018, the Sharifs sustained covered losses to the dwelling, and they gave prompt timely, and full notice of their losses and resultant claim to Swyfft and Clear Blue.  At all relevant times and at the time at which the claim made the subject of this lawsuit arose, the Sharifs owned the insured premises at the Sunset Property, and were current and paid up on the Clear Blue Policy.

93.     According to the Policy, Swyfft and Clear Blue had a duty to investigate and pay the Sharifs policy benefits for claims made for covered damages, including damage to the dwelling, other structures, personal property and loss of use.  As a result of the water penetration caused by a malfunctioning HVAC system, widespread structural damage to the house, associated presence of mold in the house, and other connected and related injuries, the Sharifs' home and personal property have been damaged and the Sharifs have been forced to pay out of pocket for living and other claim-related expenses.

94.     Swyfft and Clear Blue's failure and refusal, as described above, properly to investigate and evaluate the claim, to communicate with their insureds, to clearly accept or deny the claim, and to pay the amounts owed under the Clear Blue Policy constitute a material breach of their contract with the Sharifs.  As a proximate result of Swyfft and Clear Blue's breaches of the Clear Blue Policy, the Sharifs have been injured as more fully described under the "Damages"

**EXHIBIT C**

section, above, for which the Sharifs request an award of damages against Clear Blue and Swyfft.

Further, the Sharifs are entitled to and hereby request an award of their reasonable and necessary

attorney fees incurred or expended as a result of Clear Blue and Swyfft's breach of the Clear Blue

Policy, including as provided under Chapter 38 of the Texas Civil Practice & Remedies Code.

### Count VI
### Common Law Fraud against Swyfft and Clear Blue

95.     The pleadings and allegations of Sections 11 through 69, above, are incorporated

fully herein by reference and for all purposes.  This count is brought against Defendant's Clear

Blue and Swyfft.

96.     Clear Blue and Swyfft issued the Clear Blue Policy to the Sharifs, representing to

the Sharifs (including by and through Clear Blue and Swyfft's agent or sub-agent the Khansari

Agency) that in the event of a covered loss on the dwelling of the Sunset Property, Clear Blue and

Swyfft would (a)  reasonably, promptly investigate and adjust the claim and the claimed loss, and

(b) pay for such loss up to a limit of $1.345 million (and more in the event that the provisions of

the guaranteed replacement endorsement to the Clear Blue Policy applied).  This representation

was material, as it was the principal inducement for the Sharifs to purchase the Clear Blue Policy.

The representation was false, as Clear Blue and Swyfft had at no point the intention ever to pay

the amounts required under the Clear Blue Policy, even in the event of a covered loss.  When Clear

Blue and Swyfft made their representation, they knew the representation was false, or, alternately,

they made the representation recklessly, as a positive assertion, and without knowledge of its truth.

Clear Blue and Swyfft made the representation with the intent that the Sharifs act on it (i.e. by

purchasing the policy and paying premiums to Swyfft and Clear Blue).  The Sharifs relied on the

representation of Clear Blue and Swyfft in purchasing the Clear Blue Policy and, moreover, in not

purchasing a homeowner's policy from a reputable company that would actually pay on a covered

32

**EXHIBIT C**

loss should the event arise.  The representation proximately caused the Sharifs injury as outlined in the Damages section, above.  The Defendants' acts and omissions described under this count were undertaken intentionally, knowingly, and/or recklessly, and therefore the Sharifs are entitled to, and hereby request, an award of exemplary damages against the Defendants.  TEX. CIV. PRAC. & REM. CODE § 41.003(a)(1).

### Count VII
### Negligent Misrepresentation against Swyfft and Clear Blue

97.     The pleadings and allegations of Sections 11 through 69, above, are incorporated fully herein by reference and for all purposes.  This count is brought against Defendant's Clear Blue and Swyfft.  This count is brought in the alternative to the Fraudulent Misrepresentation count, above.

98.     In the course of their business and in a transaction in which they had a pecuniary interest, Clear Blue and Swyfft (including by and through agent and sub-agent the Khansari Agency)  made a representation to the Sharifs, namely that in the event of a covered loss on the dwelling of the Sunset Property, Clear Blue and Swyfft (a)  reasonably, promptly investigate and adjust the claim and the claimed loss, and (b) pay for such loss up to a limit of $1.345 million (and more in the event that the provisions of the guaranteed replacement endorsement to the Clear Blue Policy applied).  This information was false. Clear Blue and Swyfft supplied false information for the guidance of the Sharifs, and in doing so did not use reasonable or ordinary care in obtaining or communicating the information. Thus the information was communicated and obtained negligently.  The Sharifs justifiably relied on the information in purchasing the Clear Blue Policy and, moreover, in not purchasing a homeowner's policy from a reputable company that would actually pay on a covered loss should the event arise.  The representation proximately caused the Sharifs injury as outlined in the Damages section, above, for which the Sharifs request an award

**EXHIBIT C**

of damages.   Further, the Defendants' acts and omissions described under this count were undertaken with gross negligence, and therefore the Sharifs are entitled to, and hereby request, an award of exemplary damages against the Defendants.   TEX. CIV. PRAC. & REM. CODE § 41.003(a)(1).

### CONDITIONS PRECEDENT

99.     All conditions precedent to the Sharifs' bringing of the claims and requests for damages and other relief made herein have been performed or have occurred.

### NOTICE PURSUANT TO TEXAS RULE OF PROCEDURE 193.7

100.     Please take notice that, pursuant to Texas Rule of Civil Procedure 193.7, Plaintiffs intends to use any and all documents produced in response to written discovery by Defendants and all other parties to this action, against such part in any pretrial proceeding and in trial of this cause.

### JURY DEMAND

101.     The Sharifs demand that this cause be tried to a jury as is the Plaintiffs' right under the United States and Texas Constitutions, and the Plaintiffs tender the appropriate fee herewith

### REQUEST FOR DISCLOSURE

102.     Under Texas Rule of Civil Procedure 194, the Plaintiffs request that Defendants disclose, within 50 days of the service of this request, the information or material described in Texas Rule of Civil Procedure 194.2.

### PLAINTIFFS' FIRST REQUEST FOR PRODUCTION

103.     Pursuant to Texas Rule of Civil Procedure 196, the Plaintiffs request that Defendants respond, within 50 days of the service of this request, to Plaintiffs' First Request for Production attached as Exhibit "B."

**EXHIBIT C**

<u>**PLAINTIFFS' FIRST SET OF INTERROGATORIES**</u>

104.   Pursuant to Texas Rule of Civil Procedure 197, the Plaintiffs request that Defendants answer, within 50 days of the service of this request, Plaintiffs' First Set of Interrogatories attached as Exhibit "C."

<u>**PRAYER**</u>

WHEREFORE, PREMISES CONSIDERED, Plaintiffs ROOZBEH SHARIF and CHRISTINA SHARIF (collectively the "Sharifs") pray that Defendants NORTH AMERICAN RISK SERVICES, CLEAR BLUE INSURANCE COMPANY, and SWYFFT HOMEOWNERS INSURANCE, (collectively "Defendants") be cited to appear and answer herein and that upon final hearing of this matter the Court enter a judgment for the Sharifs and against the Defendants as follows:

(1)   actual damages;

(2)   economic damages in an amount to be determined at or before trial of this cause;

(3)   direct and indirect consequential damages in an amount to be determined at or before trial of this cause;

(4)   Mental anguish caused by the Defendants in an amount to be determined at or before trial of this cause;

(5)   Exemplary damages in the amount to be determined at or before trial of this cause;

(6)   Additional damages as provided under statute, as more fully described, above;

(7)   Restitution of premium amounts paid to Clear Blue and Swyfft;

(8)   the Sharifs' reasonable and necessary attorney fees incurred or to be incurred in connection with this cause, as more fully described, above;

(9)   pre-judgment and post-judgment interest as allowed by law; and

**EXHIBIT C**

(10)    costs of suit.

The Sharifs pray for all such other and further relief, whether at law or in equity, to which they are justly entitled.

Respectfully submitted,

MURRAH & KILLOUGH, PLLC

By: _____

Richard C. Killough
State Bar No. 24007481
C. Mark Murrah
State Bar No. 00797129
Erica Dryden
State Bar No. 24109818
3000 Weslayan St., Ste. 305
Houston, Texas 77027
Tel. (281) 501-1601
Facsimile (713) 588-8778
Email: rkillough@mktxlaw.com

**ATTORNEYS FOR PLAINTIFFS
ROOZBEH SHARIF AND CHRISTINA
SHARIF**

**EXHIBIT C**

# EXHIBIT A

EXHIBIT C



POLICY NUMBER: AL01-052376-00
POLICYHOLDER: Roozbeh Sharif

**Dear Roozbeh Sharif,**

Thank you for selecting Swyfft for your homeowners insurance.  We are committed to providing the best service to all our valued policyholders.

If you require assistance, please contact us directly or your agency below.

**Michael Khansari**
**Michael Khansari Insurance Agency**
**281-530-9730**
**khansari@sbcglobal.net**

Sincerely,
The Swyfft Team

**EXHIBIT C**



# How to Report a Claim

All claims for Swyfft Homeowners Policies with coverage provided by Clear Blue Insurance Company should be reported directly to North American Risk Services (NARS) as soon after the loss as possible while information is fresh.  Claims may be reported by any of the following options 24 hours a day, 7 days a week to the attention of the New Loss Unit.

|              |                                |
|-------------:|:-------------------------------|
| **Telephone:** | (855) 542-0917 |
| **Facsimile:** | (866) 261-8507 |
| **Website:** | swyfft.com/claims |
| **Email:** | reportaclaim@narisk.com |
| **Regular Mail:** | North American Risk Services |
|              | PO Box 166002 |
|              | Altamonte Springs, FL 32716-6002 |

**In order to ensure proper assistance, it is important to include the policy number as well as name of the insured, contact information and to provide as much information about the loss details and involved parties as possible.**

An adjuster will be assigned and after the reviewing the information provided will make personal contact so remember to include contact information such as your name, home and email addresses and alternate telephone numbers. A claim acknowledgement will be transmitted identifying the claim number and assigned claims examiner.

IL N 178 03 13

# TEXAS PERIOD TO FILE A CLAIM OR BRING LEGAL ACTION AGAINST US NOTICE – WINDSTORM OR HAIL – CATASTROPHE AREA

This Notice does not form a part of your insurance contract. No coverage is provided by this Notice, nor can it be construed to replace any provisions of your policy (including its endorsements). If there is any conflict between this Notice and the policy (including its endorsements), **the provisions of the policy (including its endorsements) shall prevail.**

Carefully read your policy, including the endorsements attached to your policy.

In accordance with Texas Insurance Code Section 2301.010(f), we are notifying you that:

1. With respect to loss or damage in the State of Texas caused by windstorm or hail in the catastrophe area, as defined by the Texas Insurance Code, any claim must be filed with us not later than one year after the date of the loss or damage that is the subject of the claim, except that a claim may be filed after the first anniversary of the date of the loss or damage for good cause shown by the person filing the claim; and

2. Any legal action brought against us under the policy for loss or damage in the State of Texas caused by windstorm or hail in the catastrophe area, as defined by the Texas Insurance Code, must be brought within the earlier of the following:

   a. Two years and one day from the date we accept or reject the claim; or

   b. Three years and one day from the date of the loss or damage that is the subject of the claim.

EXHIBIT C

# POLICY LIMITATION DISCLOSURE NOTICE
# POLLUTION

THIS POLICYHOLDERS NOTICE PROVIDES A SUMMARY OF COVERAGE CHANGES THAT APPLY TO YOUR POLICY. THIS NOTICE PROVIDES NO COVERAGE NOR CAN IT BE CONSTRUED TO REPLACE ANY PROVISION OF YOUR POLICY. FOR COMPLETE INFORMATION ON OUR COVERAGES, READ YOUR POLICY AND REVIEW YOUR DECLARATIONS PAGE. IF THERE IS ANY CONFLICT BETWEEN THE POLICY AND THIS NOTICE, THE PROVISIONS OF THE POLICY SHALL PREVAIL.

A REDUCTION IN COVERAGE HAS BEEN ADDED TO YOUR POLICY FOR:

"Bodily injury", "property damage" or "personal and advertising injury" arising out any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

Where used in this policy, the term pollutant does not include the following:

**a.** Loss caused by pollutants that escape from heating and air conditioning systems and appliances (HVAC);

**b.** Loss caused by common household chemicals used to maintain the residence premises.

**c.** Loss caused by pollutants released from a hostile fire. A hostile fire is a fire which becomes uncontrollable or breaks out from where it was intended to be."

**EXHIBIT C**

| IMPORTANT NOTICE | AVISO IMPORTANTE |
|---|---|

To obtain information or make a complaint:

Para obtener informacion o para presentar una queja:

You may call Clear Blue Insurance Company's toll-free telephone number for information or to make a complaint at:

Usted puede llamar al numero de telefono gratuito de Clear Blue Insurance Company's para obtener informacion o para presentar una queja al:

**1-844-890-6640**

**1-844-890-6640**

You may contact the Texas Department of Insurance to obtain information on companies, coverages, rights, or complaints at:

Usted puede comunicarse con el Departamento de Seguros de Texas para obtener informacion sobre companias, coberturas, derechos, o quejas al:

**1-800-252-3439**

**1-800-252-3439**

You may write to the Texas Department of Insurance at:

Usted puede escribir al Departamento de Seguros de Texas a:

P.O. Box 149104
Austin, TX 78714-9104

P.O. Box 149104
Austin, TX 78714-9104

Fax: (512) 490-1007

Fax: (512) 490-1007

Web: www.tdi.texas.gov

Sitio web: www.tdi.texas.gov

E-mail: ConsumerProtection@tdi.texas.gov

E-mail: ConsumerProtection@tdi.texas.gov

**PREMIUM OR CLAIM DISPUTES:**

**DISPUTAS POR PRIMAS DE SEGUROS O RECLAMACIONES:**

Should you have a dispute concerning your premium or about a claim you should contact the company first. If the dispute is not resolved, you may contact the Texas Department of Insurance.

Si tiene una disputa relacionada con su prima de seguro o con una reclamacion, usted debe comunicarse con la compania primero. Si la disputa no es resuelta, puede comunicarse con el Departamento de Seguros de Texas.

**ATTACH THIS NOTICE TO YOUR POLICY:**
This notice is for information only and does not become a part or condition of the attached document.

**ADJUNTE ESTE AVISO A SU POLIZA:**
Este aviso es solamente para propositos informativos y no se convierte en parte o en condicion del documento adjunto.

**EXHIBIT C**



Policy Number: AL01-052876-00

HOMEOWNERS
HO DS 01 05 11

## HOMEOWNERS POLICY DECLARATIONS

| | |
|---|---|
| Company Name: | Clear Blue Insurance Company |
| Producer Name: | Swyfft, LLC |
| Named Insured: | Roozbeh Sharif, Christina Seguin |
| Mailing Address: | 1801 Sunset Blvd<br>Houston, TX 77005 |

The Residence Premises Is Located At The Above Address Unless Otherwise Stated:

| Policy Period Year(s) | |
|---|---|
| Number Of Year(s): | |
| From:    05/10/2018 | 12:01 AM standard time at the residence premises |
| To:    05/10/2019 | 12:01 AM standard time at the residence premises |

We will provide the insurance described in this policy in return for the premium and compliance with all applicable policy provisions.

Coverage is provided where a premium or limit of liability is shown for the coverage.

| Section I – Coverages | Limit Of Liability | |
|---|---|---|
| A. Dwelling | $ 1,345,000  Guaranteed Replacement Cost applies | |
| B. Other Structures | $ 135,000 | |
| C. Personal Property | $ 540,000 | |
| D. Loss Of Use | $ 410,000 | |
| Section II – Coverages | | |
| E. Personal Liability | $ 500,000 | Each Occurrence |
| F. Medical Payments To Others | $ 5,000 | Each Person |
| Section III – Additional Coverages | | |
| Water Backup | $ 20,000 | |
| | $ | |
| | $ | |
| Total Annual Premium | $ 4,780.00 | |

| Forms And Endorsements Made Part Of This Policy<br>(Number(s) And Edition Date(s)) | | |
|---|---|---|
| Texas Period to File a Claim or Bring Legal Action Against Us Notice - Windstorm or Hail - Catastrophe Area | IL N 178 | 03 13 |
| Policy Limitation Disclosure Notice Pollution | HO SW PNTX | 06 17 |
| Important Notice | HO SWTX 05 | 04 17 |
| Homeowners Policy Declarations | HO DS 01 | 05 11 |

© Insurance Services Office, Inc., 2010   **EXHIBIT C**

| | | | |
|---|---|---|---|
| Homeowners 3 - Special Form | HO 00 03 | 05 11 |
| Guaranteed Replacement Cost | HO SW 02 | 08 17 |
| Residence Premises Definition Endorsement | HO 06 48 | 10 15 |
| Windstorm or Hail Percentage Deductible | HO 03 12 | 05 11 |
| Personal Property Replacement Cost Loss Settlement - Texas | HOSW 23 04 | 04 17 |
| Limited Water Back-Up and Sump Discharge or Overflow Coverage - Texas | HO 04 69 | 01 14 |
| Special Provisions - Texas | HO TX 01 42 | 07 17 |

| | | | |
|---|---|---|---|
| Deductible:   Section I:   1% ($13,450) | Other:   Wind/Hail Deductible: 2% ($26,900.00) |

Section II – Other Insured Locations (Address):

### Mortgagee(s)/Lienholder(s)

| Name | Address | Loan Number |
|---|---|---|
| Cadence Bank | 2800 Post Oak Boulevard Ste, 2405 Houston, TX 77056 | 6280009785 |
| | | |
| | | |

### Loss Payee(s) – Personal Property
### (Name and Address of Loss Payee and Personal Property Involved)

| Name | Address | Personal Property |
|---|---|---|
| | | |
| | | |
| | | |

### Countersignature Of Authorized Representative

| | | |
|---|---|---|
| Name: | Jerome Breslin | Maria Rodriguez |
| Title: | President | Corporate Secretary |
| Signature: | | |
| Date: | 04/18/2018 | 04/18/2018 |

EXHIBIT C

# HOMEOWNERS 3 – SPECIAL FORM

**AGREEMENT**

We will provide the insurance described in this policy in return for the premium and compliance with all applicable provisions of this policy.

**DEFINITIONS**

**A.** In this policy, "you" and "your" refer to the "named insured" shown in the Declarations and the spouse if a resident of the same household. "We", "us" and "our" refer to the Company providing this insurance.

**B.** In addition, certain words and phrases are defined as follows:

**1.** "Aircraft Liability", "Hovercraft Liability", "Motor Vehicle Liability" and "Watercraft Liability", subject to the provisions in **b.** below, mean the following:

**a.** Liability for "bodily injury" or "property damage" arising out of the:

**(1)** Ownership of such vehicle or craft by an "insured";

**(2)** Maintenance, occupancy, operation, use, loading or unloading of such vehicle or craft by any person;

**(3)** Entrustment of such vehicle or craft by an "insured" to any person;

**(4)** Failure to supervise or negligent supervision of any person involving such vehicle or craft by an "insured"; or

**(5)** Vicarious liability, whether or not imposed by law, for the actions of a child or minor involving such vehicle or craft.

**b.** For the purpose of this definition:

**(1)** Aircraft means any contrivance used or designed for flight except model or hobby aircraft not used or designed to carry people or cargo;

**(2)** Hovercraft means a self-propelled motorized ground effect vehicle and includes, but is not limited to, flarecraft and air cushion vehicles;

**(3)** Watercraft means a craft principally designed to be propelled on or in water by wind, engine power or electric motor; and

**(4)** Motor vehicle means a "motor vehicle" as defined in **7.** below.

**2.** "Bodily injury" means bodily harm, sickness or disease, including required care, loss of services and death that results.

**3.** "Business" means:

**a.** A trade, profession or occupation engaged in on a full-time, part-time or occasional basis; or

**b.** Any other activity engaged in for money or other compensation, except the following:

**(1)** One or more activities, not described in **(2)** through **(4)** below, for which no "insured" receives more than $2,000 in total compensation for the 12 months before the beginning of the policy period;

**(2)** Volunteer activities for which no money is received other than payment for expenses incurred to perform the activity;

**(3)** Providing home day care services for which no compensation is received, other than the mutual exchange of such services; or

**(4)** The rendering of home day care services to a relative of an "insured".

**4.** "Employee" means an employee of an "insured", or an employee leased to an "insured" by a labor leasing firm under an agreement between an "insured" and the labor leasing firm, whose duties are other than those performed by a "residence employee".

**5.** "Insured" means:

**a.** You and residents of your household who are:

**(1)** Your relatives; or

**(2)** Other persons under the age of 21 and in your care or the care of a resident of your household who is your relative;

**b.** A student enrolled in school full-time, as defined by the school, who was a resident of your household before moving out to attend school, provided the student is under the age of:

**(1)** 24 and your relative; or

 © Insurance Services Office, Inc., 2010

EXHIBIT C

**(2)** 21 and in your care or the care of a resident of your household who is your relative; or

**c.** Under Section **II**:

**(1)** With respect to animals or watercraft to which this policy applies, any person or organization legally responsible for these animals or watercraft which are owned by you or any person described in **5.a.** or **b.** "Insured" does not mean a person or organization using or having custody of these animals or watercraft in the course of any "business" or without consent of the owner; or

**(2)** With respect to a "motor vehicle" to which this policy applies:

**(a)** Persons while engaged in your employ or that of any person described in **5.a.** or **b.;** or

**(b)** Other persons using the vehicle on an "insured location" with your consent.

Under both Sections **I** and **II,** when the word an immediately precedes the word "insured", the words an "insured" together mean one or more "insureds".

**6.** "Insured location" means:

**a.** The "residence premises";

**b.** The part of other premises, other structures and grounds used by you as a residence; and

**(1)** Which is shown in the Declarations; or

**(2)** Which is acquired by you during the policy period for your use as a residence;

**c.** Any premises used by you in connection with a premises described in **a.** and **b.** above;

**d.** Any part of a premises:

**(1)** Not owned by an "insured"; and

**(2)** Where an "insured" is temporarily residing;

**e.** Vacant land, other than farm land, owned by or rented to an "insured";

**f.** Land owned by or rented to an "insured" on which a one-, two-, three- or four-family dwelling is being built as a residence for an "insured";

**g.** Individual or family cemetery plots or burial vaults of an "insured"; or

**h.** Any part of a premises occasionally rented to an "insured" for other than "business" use.

**7.** "Motor vehicle" means:

**a.** A self-propelled land or amphibious vehicle; or

**b.** Any trailer or semitrailer which is being carried on, towed by or hitched for towing by a vehicle described in **a.** above.

**8.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in:

**a.** "Bodily injury"; or

**b.** "Property damage".

**9.** "Property damage" means physical injury to, destruction of, or loss of use of tangible property.

**10.** "Residence employee" means:

**a.** An employee of an "insured", or an employee leased to an "insured" by a labor leasing firm, under an agreement between an "insured" and the labor leasing firm, whose duties are related to the maintenance or use of the "residence premises", including household or domestic services; or

**b.** One who performs similar duties elsewhere not related to the "business" of an "insured".

A "residence employee" does not include a temporary employee who is furnished to an "insured" to substitute for a permanent "residence employee" on leave or to meet seasonal or short-term workload conditions.

**11.** "Residence premises" means:

**a.** The one-family dwelling where you reside;

**b.** The two-, three- or four-family dwelling where you reside in at least one of the family units; or

**c.** That part of any other building where you reside;

and which is shown as the "residence premises" in the Declarations.

"Residence premises" also includes other structures and grounds at that location.

© Insurance Services Office, Inc., 2010

EXHIBIT C

# SECTION I – PROPERTY COVERAGES

## A. Coverage A – Dwelling

1. We cover:

   a. The dwelling on the "residence premises" shown in the Declarations, including structures attached to the dwelling; and

   b. Materials and supplies located on or next to the "residence premises" used to construct, alter or repair the dwelling or other structures on the "residence premises".

2. We do not cover land, including land on which the dwelling is located.

## B. Coverage B – Other Structures

1. We cover other structures on the "residence premises" set apart from the dwelling by clear space. This includes structures connected to the dwelling by only a fence, utility line, or similar connection.

2. We do not cover:

   a. Land, including land on which the other structures are located;

   b. Other structures rented or held for rental to any person not a tenant of the dwelling, unless used solely as a private garage;

   c. Other structures from which any "business" is conducted; or

   d. Other structures used to store "business" property. However, we do cover a structure that contains "business" property solely owned by an "insured" or a tenant of the dwelling, provided that "business" property does not include gaseous or liquid fuel, other than fuel in a permanently installed fuel tank of a vehicle or craft parked or stored in the structure.

3. The limit of liability for this coverage will not be more than 10% of the limit of liability that applies to Coverage **A.** Use of this coverage does not reduce the Coverage **A** limit of liability.

## C. Coverage C – Personal Property

1. **Covered Property**

   We cover personal property owned or used by an "insured" while it is anywhere in the world. After a loss and at your request, we will cover personal property owned by:

   a. Others while the property is on the part of the "residence premises" occupied by an "insured"; or

   b. A guest or a "residence employee", while the property is in any residence occupied by an "insured".

2. **Limit For Property At Other Locations**

   a. **Other Residences**

      Our limit of liability for personal property usually located at an "insured's" residence, other than the "residence premises", is 10% of the limit of liability for Coverage **C,** or $1,000, whichever is greater. However, this limitation does not apply to personal property:

      (1) Moved from the "residence premises" because it is:

         (a) Being repaired, renovated or rebuilt; and

         (b) Not fit to live in or store property in; or

      (2) In a newly acquired principal residence for 30 days from the time you begin to move the property there.

   b. **Self-storage Facilities**

      Our limit of liability for personal property owned or used by an "insured" and located in a self-storage facility is 10% of the limit of liability for Coverage **C,** or $1,000, whichever is greater. However, this limitation does not apply to personal property:

      (1) Moved from the "residence premises" because it is:

         (a) Being repaired, renovated or rebuilt; and

         (b) Not fit to live in or store property in; or

      (2) Usually located in an "insured's" residence, other than the "residence premises".

 © Insurance Services Office, Inc., 2010 **EXHIBIT C**

**3. Special Limits Of Liability**

The special limit for each category shown below is the total limit for each loss for all property in that category. These special limits do not increase the Coverage **C** limit of liability.

**a.** $200 on money, bank notes, bullion, gold other than goldware, silver other than silverware, platinum other than platinumware, coins, medals, scrip, stored value cards and smart cards.

**b.** $1,500 on securities, accounts, deeds, evidences of debt, letters of credit, notes other than bank notes, manuscripts, personal records, passports, tickets and stamps. This dollar limit applies to these categories regardless of the medium (such as paper or computer software) on which the material exists.

This limit includes the cost to research, replace or restore the information from the lost or damaged material.

**c.** $1,500 on watercraft of all types, including their trailers, furnishings, equipment and outboard engines or motors.

**d.** $1,500 on trailers or semitrailers not used with watercraft of all types.

**e.** $1,500 for loss by theft of jewelry, watches, furs, precious and semiprecious stones.

**f.** $2,500 for loss by theft of firearms and related equipment.

**g.** $2,500 for loss by theft of silverware, silver-plated ware, goldware, gold-plated ware, platinumware, platinum-plated ware and pewterware. This includes flatware, hollowware, tea sets, trays and trophies made of or including silver, gold or pewter.

**h.** $2,500 on property, on the "residence premises", used primarily for "business" purposes.

**i.** $1,500 on property, away from the "residence premises", used primarily for "business" purposes. However, this limit does not apply to antennas, tapes, wires, records, disks or other media that are:

**(1)** Used with electronic equipment that reproduces, receives or transmits audio, visual or data signals; and

**(2)** In or upon a "motor vehicle".

**j.** $1,500 on portable electronic equipment that:

**(1)** Reproduces, receives or transmits audio, visual or data signals;

**(2)** Is designed to be operated by more than one power source, one of which is a "motor vehicle's" electrical system; and

**(3)** Is in or upon a "motor vehicle".

**k.** $250 for antennas, tapes, wires, records, disks or other media that are:

**(1)** Used with electronic equipment that reproduces, receives or transmits audio, visual or data signals; and

**(2)** In or upon a "motor vehicle".

**4. Property Not Covered**

We do not cover:

**a.** Articles separately described and specifically insured, regardless of the limit for which they are insured, in this or other insurance;

**b.** Animals, birds or fish;

**c.** "Motor vehicles".

This includes a "motor vehicle's" equipment and parts. However, this Paragraph **4.c.** does not apply to:

**(1)** Portable electronic equipment that:

**(a)** Reproduces, receives or transmits audio, visual or data signals; and

**(b)** Is designed so that it may be operated from a power source other than a "motor vehicle's" electrical system.

**(2)** "Motor vehicles" not required to be registered for use on public roads or property which are:

**(a)** Used solely to service a residence; or

**(b)** Designed to assist the handicapped;

**d.** Aircraft, meaning any contrivance used or designed for flight, including any parts whether or not attached to the aircraft.

We do cover model or hobby aircraft not used or designed to carry people or cargo;

**e.** Hovercraft and parts. Hovercraft means a self-propelled motorized ground effect vehicle and includes, but is not limited to, flarecraft and air cushion vehicles;

**f.** Property of roomers, boarders and other tenants, except property of roomers and boarders related to an "insured";

EXHIBIT C

g. Property in an apartment regularly rented or held for rental to others by an "insured", except as provided in **E.10.** Landlord's Furnishings under Section **I** – Property Coverages;

h. Property rented or held for rental to others off the "residence premises";

i. "Business" data, including such data stored in:

(1) Books of account, drawings or other paper records; or

(2) Computers and related equipment.

We do cover the cost of blank recording or storage media and of prerecorded computer programs available on the retail market;

j. Credit cards, electronic fund transfer cards or access devices used solely for deposit, withdrawal or transfer of funds except as provided in **E.6.** Credit Card, Electronic Fund Transfer Card Or Access Device, Forgery And Counterfeit Money under Section **I** – Property Coverages; or

k. Water or steam.

## D. Coverage D – Loss Of Use

The limit of liability for Coverage **D** is the total limit for the coverages in **1.** Additional Living Expense, **2.** Fair Rental Value and **3.** Civil Authority Prohibits Use below.

### 1. Additional Living Expense

If a loss covered under Section **I** makes that part of the "residence premises" where you reside not fit to live in, we cover any necessary increase in living expenses incurred by you so that your household can maintain its normal standard of living.

Payment will be for the shortest time required to repair or replace the damage or, if you permanently relocate, the shortest time required for your household to settle elsewhere.

### 2. Fair Rental Value

If a loss covered under Section **I** makes that part of the "residence premises" rented to others or held for rental by you not fit to live in, we cover the fair rental value of such premises less any expenses that do not continue while it is not fit to live in.

Payment will be for the shortest time required to repair or replace such premises.

### 3. Civil Authority Prohibits Use

If a civil authority prohibits you from use of the "residence premises" as a result of direct damage to neighboring premises by a Peril Insured Against, we cover the loss as provided in **1.** Additional Living Expense and **2.** Fair Rental Value above for no more than two weeks.

### 4. Loss Or Expense Not Covered

We do not cover loss or expense due to cancellation of a lease or agreement.

The periods of time under **1.** Additional Living Expense, **2.** Fair Rental Value and **3.** Civil Authority Prohibits Use above are not limited by expiration of this policy.

## E. Additional Coverages

### 1. Debris Removal

a. We will pay your reasonable expense for the removal of:

(1) Debris of covered property if a Peril Insured Against that applies to the damaged property causes the loss; or

(2) Ash, dust or particles from a volcanic eruption that has caused direct loss to a building or property contained in a building.

This expense is included in the limit of liability that applies to the damaged property. If the amount to be paid for the actual damage to the property plus the debris removal expense is more than the limit of liability for the damaged property, an additional 5% of that limit is available for such expense.

b. We will also pay your reasonable expense, up to $1,000, for the removal from the "residence premises" of:

(1) Your trees felled by the peril of Windstorm or Hail or Weight of Ice, Snow or Sleet; or

(2) A neighbor's trees felled by a Peril Insured Against under Coverage **C**;

provided the trees:

(3) Damage a covered structure; or

(4) Do not damage a covered structure, but:

(a) Block a driveway on the "residence premises" which prevents a "motor vehicle", that is registered for use on public roads or property, from entering or leaving the "residence premises"; or

EXHIBIT C

**(b)** Block a ramp or other fixture designed to assist a handicapped person to enter or leave the dwelling building.

The $1,000 limit is the most we will pay in any one loss, regardless of the number of fallen trees. No more than $500 of this limit will be paid for the removal of any one tree.

This coverage is additional insurance.

**2. Reasonable Repairs**

**a.** We will pay the reasonable cost incurred by you for the necessary measures taken solely to protect covered property that is damaged by a Peril Insured Against from further damage.

**b.** If the measures taken involve repair to other damaged property, we will only pay if that property is covered under this policy and the damage is caused by a Peril Insured Against. This coverage does not:

**(1)** Increase the limit of liability that applies to the covered property; or

**(2)** Relieve you of your duties, in case of a loss to covered property, described in **C.4.** under Section **I** – Conditions.

**3. Trees, Shrubs And Other Plants**

We cover trees, shrubs, plants or lawns, on the "residence premises", for loss caused by the following Perils Insured Against:

**a.** Fire or Lightning;

**b.** Explosion;

**c.** Riot or Civil Commotion;

**d.** Aircraft;

**e.** Vehicles not owned or operated by a resident of the "residence premises";

**f.** Vandalism or Malicious Mischief; or

**g.** Theft.

We will pay up to 5% of the limit of liability that applies to the dwelling for all trees, shrubs, plants or lawns. No more than $500 of this limit will be paid for any one tree, shrub or plant. We do not cover property grown for "business" purposes.

This coverage is additional insurance.

**4. Fire Department Service Charge**

We will pay up to $500 for your liability assumed by contract or agreement for fire department charges incurred when the fire department is called to save or protect covered property from a Peril Insured Against. We do not cover fire department service charges if the property is located within the limits of the city, municipality or protection district furnishing the fire department response.

This coverage is additional insurance. No deductible applies to this coverage.

**5. Property Removed**

We insure covered property against direct loss from any cause while being removed from a premises endangered by a Peril Insured Against and for no more than 30 days while removed.

This coverage does not change the limit of liability that applies to the property being removed.

**6. Credit Card, Electronic Fund Transfer Card Or Access Device, Forgery And Counterfeit Money**

**a.** We will pay up to $500 for:

**(1)** The legal obligation of an "insured" to pay because of the theft or unauthorized use of credit cards issued to or registered in an "insured's" name;

**(2)** Loss resulting from theft or unauthorized use of an electronic fund transfer card or access device used for deposit, withdrawal or transfer of funds, issued to or registered in an "insured's" name;

**(3)** Loss to an "insured" caused by forgery or alteration of any check or negotiable instrument; and

**(4)** Loss to an "insured" through acceptance in good faith of counterfeit United States or Canadian paper currency.

All loss resulting from a series of acts committed by any one person or in which any one person is concerned or implicated is considered to be one loss.

© Insurance Services Office, Inc., 2010

EXHIBIT C

This coverage is additional insurance. No deductible applies to this coverage.

**b.** We do not cover:

**(1)** Use of a credit card, electronic fund transfer card or access device:

**(a)** By a resident of your household;

**(b)** By a person who has been entrusted with either type of card or access device; or

**(c)** If an "insured" has not complied with all terms and conditions under which the cards are issued or the devices accessed; or

**(2)** Loss arising out of "business" use or dishonesty of an "insured".

**c.** If the coverage in **a.** above applies, the following defense provisions also apply:

**(1)** We may investigate and settle any claim or suit that we decide is appropriate. Our duty to defend a claim or suit ends when the amount we pay for the loss equals our limit of liability.

**(2)** If a suit is brought against an "insured" for liability under **a.(1)** or **(2)** above, we will provide a defense at our expense by counsel of our choice.

**(3)** We have the option to defend at our expense an "insured" or an "insured's" bank against any suit for the enforcement of payment under **a.(3)** above.

**7. Loss Assessment**

**a.** We will pay up to $1,000 for your share of loss assessment charged during the policy period against you, as owner or tenant of the "residence premises", by a corporation or association of property owners. The assessment must be made as a result of direct loss to property, owned by all members collectively, of the type that would be covered by this policy if owned by you, caused by a Peril Insured Against under Coverage **A,** other than:

**(1)** Earthquake; or

**(2)** Land shock waves or tremors before, during or after a volcanic eruption.

The limit of $1,000 is the most we will pay with respect to any one loss, regardless of the number of assessments. We will only apply one deductible, per unit, to the total amount of any one loss to the property described above, regardless of the number of assessments.

**b.** We do not cover assessments charged against you or a corporation or association of property owners by any governmental body.

**c.** Paragraph **Q.** Policy Period under Section **I** – Conditions does not apply to this coverage.

This coverage is additional insurance.

**8. Collapse**

**a.** The coverage provided under this Additional Coverage – Collapse applies only to an abrupt collapse.

**b.** For the purpose of this Additional Coverage – Collapse, abrupt collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose.

**c.** This Additional Coverage – Collapse does not apply to:

**(1)** A building or any part of a building that is in danger of falling down or caving in;

**(2)** A part of a building that is standing, even if it has separated from another part of the building; or

**(3)** A building or any part of a building that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

**d.** We insure for direct physical loss to covered property involving abrupt collapse of a building or any part of a building if such collapse was caused by one or more of the following:

**(1)** The Perils Insured Against named under Coverage **C;**

**(2)** Decay, of a building or any part of a building, that is hidden from view, unless the presence of such decay is known to an "insured" prior to collapse;

**(3)** Insect or vermin damage, to a building or any part of a building, that is hidden from view, unless the presence of such damage is known to an "insured" prior to collapse;

**(4)** Weight of contents, equipment, animals or people;

**(5)** Weight of rain which collects on a roof; or

EXHIBIT C

(6) Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation.

**e.** Loss to an awning, fence, patio, deck, pavement, swimming pool, underground pipe, flue, drain, cesspool, septic tank, foundation, retaining wall, bulkhead, pier, wharf or dock is not included under **d.(2)** through **(6)** above, unless the loss is a direct result of the collapse of a building or any part of a building.

**f.** This coverage does not increase the limit of liability that applies to the damaged covered property.

**9. Glass Or Safety Glazing Material**

**a.** We cover:

(1) The breakage of glass or safety glazing material which is part of a covered building, storm door or storm window;

(2) The breakage of glass or safety glazing material which is part of a covered building, storm door or storm window when caused directly by earth movement; and

(3) The direct physical loss to covered property caused solely by the pieces, fragments or splinters of broken glass or safety glazing material which is part of a building, storm door or storm window.

**b.** This coverage does not include loss:

(1) To covered property which results because the glass or safety glazing material has been broken, except as provided in **a.(3)** above; or

(2) On the "residence premises" if the dwelling has been vacant for more than 60 consecutive days immediately before the loss, except when the breakage results directly from earth movement as provided in **a.(2)** above. A dwelling being constructed is not considered vacant.

**c.** This coverage does not increase the limit of liability that applies to the damaged property.

**10. Landlord's Furnishings**

We will pay up to $2,500 for your appliances, carpeting and other household furnishings, in each apartment on the "residence premises" regularly rented or held for rental to others by an "insured", for loss caused by a Peril Insured Against in Coverage **C,** other than Theft.

This limit is the most we will pay in any one loss regardless of the number of appliances, carpeting or other household furnishings involved in the loss.

This coverage does not increase the limit of liability applying to the damaged property.

**11. Ordinance Or Law**

**a.** You may use up to 10% of the limit of liability that applies to Coverage **A** for the increased costs you incur due to the enforcement of any ordinance or law which requires or regulates:

(1) The construction, demolition, remodeling, renovation or repair of that part of a covered building or other structure damaged by a Peril Insured Against;

(2) The demolition and reconstruction of the undamaged part of a covered building or other structure, when that building or other structure must be totally demolished because of damage by a Peril Insured Against to another part of that covered building or other structure; or

(3) The remodeling, removal or replacement of the portion of the undamaged part of a covered building or other structure necessary to complete the remodeling, repair or replacement of that part of the covered building or other structure damaged by a Peril Insured Against.

**b.** You may use all or part of this ordinance or law coverage to pay for the increased costs you incur to remove debris resulting from the construction, demolition, remodeling, renovation, repair or replacement of property as stated in **a.** above.

**c.** We do not cover:

(1) The loss in value to any covered building or other structure due to the requirements of any ordinance or law; or

(2) The costs to comply with any ordinance or law which requires any "insured" or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, pollutants in or on any covered building or other structure.

 © Insurance Services Office, Inc., 2010

**EXHIBIT C**

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

This coverage is additional insurance.

**12. Grave Markers**

We will pay up to $5,000 for grave markers, including mausoleums, on or away from the "residence premises" for loss caused by a Peril Insured Against under Coverage **C**.

This coverage does not increase the limits of liability that apply to the damaged covered property.

## SECTION I – PERILS INSURED AGAINST

### A. Coverage A – Dwelling And Coverage B – Other Structures

**1.** We insure against direct physical loss to property described in Coverages **A** and **B**.

**2.** We do not insure, however, for loss:

**a.** Excluded under Section **I** – Exclusions;

**b.** Involving collapse, including any of the following conditions of property or any part of the property:

**(1)** An abrupt falling down or caving in;

**(2)** Loss of structural integrity, including separation of parts of the property or property in danger of falling down or caving in; or

**(3)** Any cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion as such condition relates to **(1)** or **(2)** above;

except as provided in **E.8.** Collapse under Section **I** – Property Coverages; or

**c.** Caused by:

**(1)** Freezing of a plumbing, heating, air conditioning or automatic fire protective sprinkler system or of a household appliance, or by discharge, leakage or overflow from within the system or appliance caused by freezing. This provision does not apply if you have used reasonable care to:

**(a)** Maintain heat in the building; or

**(b)** Shut off the water supply and drain all systems and appliances of water.

However, if the building is protected by an automatic fire protective sprinkler system, you must use reasonable care to continue the water supply and maintain heat in the building for coverage to apply.

For purposes of this provision, a plumbing system or household appliance does not include a sump, sump pump or related equipment or a roof drain, gutter, downspout or similar fixtures or equipment;

**(2)** Freezing, thawing, pressure or weight of water or ice, whether driven by wind or not, to a:

**(a)** Fence, pavement, patio or swimming pool;

**(b)** Footing, foundation, bulkhead, wall, or any other structure or device that supports all or part of a building, or other structure;

**(c)** Retaining wall or bulkhead that does not support all or part of a building or other structure; or

**(d)** Pier, wharf or dock;

**(3)** Theft in or to a dwelling under construction, or of materials and supplies for use in the construction until the dwelling is finished and occupied;

**(4)** Vandalism and malicious mischief, and any ensuing loss caused by any intentional and wrongful act committed in the course of the vandalism or malicious mischief, if the dwelling has been vacant for more than 60 consecutive days immediately before the loss. A dwelling being constructed is not considered vacant;

**(5)** Mold, fungus or wet rot. However, we do insure for loss caused by mold, fungus or wet rot that is hidden within the walls or ceilings or beneath the floors or above the ceilings of a structure if such loss results from the accidental discharge or overflow of water or steam from within:

**(a)** A plumbing, heating, air conditioning or automatic fire protective sprinkler system, or a household appliance, on the "residence premises"; or

**(b)** A storm drain, or water, steam or sewer pipes, off the "residence premises".

© Insurance Services Office, Inc., 2010

EXHIBIT C

For purposes of this provision, a plumbing system or household appliance does not include a sump, sump pump or related equipment or a roof drain, gutter, downspout or similar fixtures or equipment; or

**(6)** Any of the following:

**(a)** Wear and tear, marring, deterioration;

**(b)** Mechanical breakdown, latent defect, inherent vice or any quality in property that causes it to damage or destroy itself;

**(c)** Smog, rust or other corrosion, or dry rot;

**(d)** Smoke from agricultural smudging or industrial operations;

**(e)** Discharge, dispersal, seepage, migration, release or escape of pollutants unless the discharge, dispersal, seepage, migration, release or escape is itself caused by a Peril Insured Against named under Coverage **C**.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed;

**(f)** Settling, shrinking, bulging or expansion, including resultant cracking, of bulkheads, pavements, patios, footings, foundations, walls, floors, roofs or ceilings;

**(g)** Birds, rodents or insects;

**(h)** Nesting or infestation, or discharge or release of waste products or secretions, by any animals; or

**(i)** Animals owned or kept by an "insured".

**Exception To c.(6)**

Unless the loss is otherwise excluded, we cover loss to property covered under Coverage **A** or **B** resulting from an accidental discharge or overflow of water or steam from within a:

**(i)** Storm drain, or water, steam or sewer pipe, off the "residence premises"; or

**(ii)** Plumbing, heating, air conditioning or automatic fire protective sprinkler system or household appliance on the "residence premises". This includes the cost to tear out and replace any part of a building, or other structure, on the "residence premises", but only when necessary to repair the system or appliance. However, such tear out and replacement coverage only applies to other structures if the water or steam causes actual damage to a building on the "residence premises".

We do not cover loss to the system or appliance from which this water or steam escaped.

For purposes of this provision, a plumbing system or household appliance does not include a sump, sump pump or related equipment or a roof drain, gutter, downspout or similar fixtures or equipment.

Section **I** – Exclusion **A.3.** Water, Paragraphs **a.** and **c.** that apply to surface water and water below the surface of the ground do not apply to loss by water covered under **c.(5)** and **(6)** above.

Under **2.b.** and **c.** above, any ensuing loss to property described in Coverages **A** and **B** not precluded by any other provision in this policy is covered.

**B. Coverage C – Personal Property**

We insure for direct physical loss to the property described in Coverage **C** caused by any of the following perils unless the loss is excluded in Section **I** – Exclusions.

**1. Fire Or Lightning**

**2. Windstorm Or Hail**

This peril includes loss to watercraft of all types and their trailers, furnishings, equipment, and outboard engines or motors, only while inside a fully enclosed building.

This peril does not include loss to the property contained in a building caused by rain, snow, sleet, sand or dust unless the direct force of wind or hail damages the building causing an opening in a roof or wall and the rain, snow, sleet, sand or dust enters through this opening.

EXHIBIT C

**3. Explosion**

**4. Riot Or Civil Commotion**

**5. Aircraft**

This peril includes self-propelled missiles and spacecraft.

**6. Vehicles**

**7. Smoke**

This peril means sudden and accidental damage from smoke, including the emission or puffback of smoke, soot, fumes or vapors from a boiler, furnace or related equipment.

This peril does not include loss caused by smoke from agricultural smudging or industrial operations.

**8. Vandalism Or Malicious Mischief**

**9. Theft**

**a.** This peril includes attempted theft and loss of property from a known place when it is likely that the property has been stolen.

**b.** This peril does not include loss caused by theft:

(1) Committed by an "insured";

(2) In or to a dwelling under construction, or of materials and supplies for use in the construction until the dwelling is finished and occupied;

(3) From that part of a "residence premises" rented by an "insured" to someone other than another "insured"; or

(4) That occurs off the "residence premises" of:

(a) Trailers, semitrailers and campers;

(b) Watercraft of all types, and their furnishings, equipment and outboard engines or motors; or

(c) Property while at any other residence owned by, rented to, or occupied by an "insured", except while an "insured" is temporarily living there. Property of an "insured" who is a student is covered while at the residence the student occupies to attend school as long as the student has been there at any time during the 90 days immediately before the loss.

**10. Falling Objects**

This peril does not include loss to property contained in a building unless the roof or an outside wall of the building is first damaged by a falling object. Damage to the falling object itself is not included.

**11. Weight Of Ice, Snow Or Sleet**

This peril means weight of ice, snow or sleet which causes damage to property contained in a building.

**12. Accidental Discharge Or Overflow Of Water Or Steam**

**a.** This peril means accidental discharge or overflow of water or steam from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system or from within a household appliance.

**b.** This peril does not include loss:

(1) To the system or appliance from which the water or steam escaped;

(2) Caused by or resulting from freezing except as provided in Peril Insured Against **14.** Freezing;

(3) On the "residence premises" caused by accidental discharge or overflow which occurs off the "residence premises"; or

(4) Caused by mold, fungus or wet rot unless hidden within the walls or ceilings or beneath the floors or above the ceilings of a structure.

**c.** In this peril, a plumbing system or household appliance does not include a sump, sump pump or related equipment or a roof drain, gutter, downspout or similar fixtures or equipment.

**d.** Section **I** – Exclusion **A.3.** Water, Paragraphs **a.** and **c.** that apply to surface water and water below the surface of the ground do not apply to loss by water covered under this peril.

**13. Sudden And Accidental Tearing Apart, Cracking, Burning Or Bulging**

This peril means sudden and accidental tearing apart, cracking, burning or bulging of a steam or hot water heating system, an air conditioning or automatic fire protective sprinkler system, or an appliance for heating water.

We do not cover loss caused by or resulting from freezing under this peril.

EXHIBIT C

**14. Freezing**

    **a.** This peril means freezing of a plumbing, heating, air conditioning or automatic fire protective sprinkler system or of a household appliance, but only if you have used reasonable care to:

        **(1)** Maintain heat in the building; or

        **(2)** Shut off the water supply and drain all systems and appliances of water.

        However, if the building is protected by an automatic fire protective sprinkler system, you must use reasonable care to continue the water supply and maintain heat in the building for coverage to apply.

    **b.** In this peril, a plumbing system or household appliance does not include a sump, sump pump or related equipment or a roof drain, gutter, downspout or similar fixtures or equipment.

**15. Sudden And Accidental Damage From Artificially Generated Electrical Current**

    This peril does not include loss to tubes, transistors, electronic components or circuitry that is a part of appliances, fixtures, computers, home entertainment units or other types of electronic apparatus.

**16. Volcanic Eruption**

    This peril does not include loss caused by earthquake, land shock waves or tremors.

## SECTION I – EXCLUSIONS

**A.** We do not insure for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss. These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area.

    **1. Ordinance Or Law**

        Ordinance Or Law means any ordinance or law:

        **a.** Requiring or regulating the construction, demolition, remodeling, renovation or repair of property, including removal of any resulting debris. This Exclusion **A.1.a.** does not apply to the amount of coverage that may be provided for in **E.11.** Ordinance Or Law under Section **I – Property Coverages;**

        **b.** The requirements of which result in a loss in value to property; or

    **c.** Requiring any "insured" or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, pollutants.

        Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

    This Exclusion **A.1.** applies whether or not the property has been physically damaged.

    **2. Earth Movement**

        Earth Movement means:

        **a.** Earthquake, including land shock waves or tremors before, during or after a volcanic eruption;

        **b.** Landslide, mudslide or mudflow;

        **c.** Subsidence or sinkhole; or

        **d.** Any other earth movement including earth sinking, rising or shifting.

        This Exclusion **A.2.** applies regardless of whether any of the above, in **A.2.a.** through **A.2.d.,** is caused by an act of nature or is otherwise caused.

        However, direct loss by fire, explosion or theft resulting from any of the above, in **A.2.a.** through **A.2.d.,** is covered.

    **3. Water**

        This means:

        **a.** Flood, surface water, waves, including tidal wave and tsunami, tides, tidal water, overflow of any body of water, or spray from any of these, all whether or not driven by wind, including storm surge;

        **b.** Water which:

            **(1)** Backs up through sewers or drains; or

            **(2)** Overflows or is otherwise discharged from a sump, sump pump or related equipment;

        **c.** Water below the surface of the ground, including water which exerts pressure on, or seeps, leaks or flows through a building, sidewalk, driveway, patio, foundation, swimming pool or other structure; or

        **d.** Waterborne material carried or otherwise moved by any of the water referred to in **A.3.a.** through **A.3.c.** of this exclusion.

© Insurance Services Office, Inc., 2010

EXHIBIT C

This Exclusion **A.3.** applies regardless of whether any of the above, in **A.3.a.** through **A.3.d.,** is caused by an act of nature or is otherwise caused.

This Exclusion **A.3.** applies to, but is not limited to, escape, overflow or discharge, for any reason, of water or waterborne material from a dam, levee, seawall or any other boundary or containment system.

However, direct loss by fire, explosion or theft resulting from any of the above, in **A.3.a.** through **A.3.d.,** is covered.

**4. Power Failure**

Power Failure means the failure of power or other utility service if the failure takes place off the "residence premises". But if the failure results in a loss, from a Peril Insured Against on the "residence premises", we will pay for the loss caused by that peril.

**5. Neglect**

Neglect means neglect of an "insured" to use all reasonable means to save and preserve property at and after the time of a loss.

**6. War**

War includes the following and any consequence of any of the following:

**a.** Undeclared war, civil war, insurrection, rebellion or revolution;

**b.** Warlike act by a military force or military personnel; or

**c.** Destruction, seizure or use for a military purpose.

Discharge of a nuclear weapon will be deemed a warlike act even if accidental.

**7. Nuclear Hazard**

This Exclusion **A.7.** pertains to Nuclear Hazard to the extent set forth in **N. Nuclear Hazard** Clause under Section **I – Conditions**.

**8. Intentional Loss**

Intentional Loss means any loss arising out of any act an "insured" commits or conspires to commit with the intent to cause a loss.

In the event of such loss, no "insured" is entitled to coverage, even "insureds" who did not commit or conspire to commit the act causing the loss.

**9. Governmental Action**

Governmental Action means the destruction, confiscation or seizure of property described in Coverage **A, B** or **C** by order of any governmental or public authority.

This exclusion does not apply to such acts ordered by any governmental or public authority that are taken at the time of a fire to prevent its spread, if the loss caused by fire would be covered under this policy.

**B.** We do not insure for loss to property described in Coverages **A** and **B** caused by any of the following. However, any ensuing loss to property described in Coverages **A** and **B** not precluded by any other provision in this policy is covered.

**1.** Weather conditions. However, this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in **A.** above to produce the loss.

**2.** Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

**3.** Faulty, inadequate or defective:

**a.** Planning, zoning, development, surveying, siting;

**b.** Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

**c.** Materials used in repair, construction, renovation or remodeling; or

**d.** Maintenance;

of part or all of any property whether on or off the "residence premises".

**SECTION I – CONDITIONS**

**A. Insurable Interest And Limit Of Liability**

Even if more than one person has an insurable interest in the property covered, we will not be liable in any one loss:

**1.** To an "insured" for more than the amount of such "insured's" interest at the time of loss; or

**2.** For more than the applicable limit of liability.

**B. Deductible**

Unless otherwise noted in this policy, the following deductible provision applies:

With respect to any one loss:

**1.** Subject to the applicable limit of liability, we will pay only that part of the total of all loss payable that exceeds the deductible amount shown in the Declarations.

**2.** If two or more deductibles under this policy apply to the loss, only the highest deductible amount will apply.

© Insurance Services Office, Inc., 2010

**EXHIBIT C**

## C. Duties After Loss

In case of a loss to covered property, we have no duty to provide coverage under this policy if the failure to comply with the following duties is prejudicial to us. These duties must be performed either by you, an "insured" seeking coverage, or a representative of either:

**1.** Give prompt notice to us or our agent;

**2.** Notify the police in case of loss by theft;

**3.** Notify the credit card or electronic fund transfer card or access device company in case of loss as provided for in **E.6.** Credit Card, Electronic Fund Transfer Card Or Access Device, Forgery And Counterfeit Money under Section **I – Property Coverages;**

**4.** Protect the property from further damage. If repairs to the property are required, you must:

    **a.** Make reasonable and necessary repairs to protect the property; and

    **b.** Keep an accurate record of repair expenses;

**5.** Cooperate with us in the investigation of a claim;

**6.** Prepare an inventory of damaged personal property showing the quantity, description, actual cash value and amount of loss. Attach all bills, receipts and related documents that justify the figures in the inventory;

**7.** As often as we reasonably require:

    **a.** Show the damaged property;

    **b.** Provide us with records and documents we request and permit us to make copies; and

    **c.** Submit to examination under oath, while not in the presence of another "insured", and sign the same;

**8.** Send to us, within 60 days after our request, your signed, sworn proof of loss which sets forth, to the best of your knowledge and belief:

    **a.** The time and cause of loss;

    **b.** The interests of all "insureds" and all others in the property involved and all liens on the property;

    **c.** Other insurance which may cover the loss;

    **d.** Changes in title or occupancy of the property during the term of the policy;

    **e.** Specifications of damaged buildings and detailed repair estimates;

    **f.** The inventory of damaged personal property described in **6.** above;

    **g.** Receipts for additional living expenses incurred and records that support the fair rental value loss; and

    **h.** Evidence or affidavit that supports a claim under **E.6.** Credit Card, Electronic Fund Transfer Card Or Access Device, Forgery And Counterfeit Money under Section **I – Property Coverages,** stating the amount and cause of loss.

## D. Loss Settlement

In this Condition **D.,** the terms "cost to repair or replace" and "replacement cost" do not include the increased costs incurred to comply with the enforcement of any ordinance or law, except to the extent that coverage for these increased costs is provided in **E.11.** Ordinance Or Law under Section **I – Property Coverages.** Covered property losses are settled as follows:

**1.** Property of the following types:

    **a.** Personal property;

    **b.** Awnings, carpeting, household appliances, outdoor antennas and outdoor equipment, whether or not attached to buildings;

    **c.** Structures that are not buildings; and

    **d.** Grave markers, including mausoleums;

at actual cash value at the time of loss but not more than the amount required to repair or replace.

**2.** Buildings covered under Coverage **A** or **B** at replacement cost without deduction for depreciation, subject to the following:

    **a.** If, at the time of loss, the amount of insurance in this policy on the damaged building is 80% or more of the full replacement cost of the building immediately before the loss, we will pay the cost to repair or replace, without deduction for depreciation, but not more than the least of the following amounts:

        **(1)** The limit of liability under this policy that applies to the building;

        **(2)** The replacement cost of that part of the building damaged with material of like kind and quality and for like use; or

        **(3)** The necessary amount actually spent to repair or replace the damaged building.

    If the building is rebuilt at a new premises, the cost described in **(2)** above is limited to the cost which would have been incurred if the building had been built at the original premises.

© Insurance Services Office, Inc., 2010

EXHIBIT C

**b.** If, at the time of loss, the amount of insurance in this policy on the damaged building is less than 80% of the full replacement cost of the building immediately before the loss, we will pay the greater of the following amounts, but not more than the limit of liability under this policy that applies to the building:

**(1)** The actual cash value of that part of the building damaged; or

**(2)** That proportion of the cost to repair or replace, without deduction for depreciation, that part of the building damaged, which the total amount of insurance in this policy on the damaged building bears to 80% of the replacement cost of the building.

**c.** To determine the amount of insurance required to equal 80% of the full replacement cost of the building immediately before the loss, do not include the value of:

**(1)** Excavations, footings, foundations, piers, or any other structures or devices that support all or part of the building, which are below the undersurface of the lowest basement floor;

**(2)** Those supports described in **(1)** above which are below the surface of the ground inside the foundation walls, if there is no basement; and

**(3)** Underground flues, pipes, wiring and drains.

**d.** We will pay no more than the actual cash value of the damage until actual repair or replacement is complete. Once actual repair or replacement is complete, we will settle the loss as noted in **2.a.** and **b.** above.

However, if the cost to repair or replace the damage is both:

**(1)** Less than 5% of the amount of insurance in this policy on the building; and

**(2)** Less than $2,500;

we will settle the loss as noted in **2.a.** and **b.** above whether or not actual repair or replacement is complete.

**e.** You may disregard the replacement cost loss settlement provisions and make claim under this policy for loss to buildings on an actual cash value basis. You may then make claim for any additional liability according to the provisions of this Condition **D.** Loss Settlement, provided you notify us, within 180 days after the date of loss, of your intent to repair or replace the damaged building.

**E. Loss To A Pair Or Set**

In case of loss to a pair or set we may elect to:

**1.** Repair or replace any part to restore the pair or set to its value before the loss; or

**2.** Pay the difference between actual cash value of the property before and after the loss.

**F. Appraisal**

If you and we fail to agree on the amount of loss, either may demand an appraisal of the loss. In this event, each party will choose a competent and impartial appraiser within 20 days after receiving a written request from the other. The two appraisers will choose an umpire. If they cannot agree upon an umpire within 15 days, you or we may request that the choice be made by a judge of a court of record in the state where the "residence premises" is located. The appraisers will separately set the amount of loss. If the appraisers submit a written report of an agreement to us, the amount agreed upon will be the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will set the amount of loss.

Each party will:

**1.** Pay its own appraiser; and

**2.** Bear the other expenses of the appraisal and umpire equally.

**G. Other Insurance And Service Agreement**

If a loss covered by this policy is also covered by:

**1.** Other insurance, we will pay only the proportion of the loss that the limit of liability that applies under this policy bears to the total amount of insurance covering the loss; or

**2.** A service agreement, this insurance is excess over any amounts payable under any such agreement. Service agreement means a service plan, property restoration plan, home warranty or other similar service warranty agreement, even if it is characterized as insurance.

 © Insurance Services Office, Inc., 2010 **EXHIBIT C**

### H. Suit Against Us

No action can be brought against us unless there has been full compliance with all of the terms under Section **I** of this policy and the action is started within two years after the date of loss.

### I. Our Option

If we give you written notice within 30 days after we receive your signed, sworn proof of loss, we may repair or replace any part of the damaged property with material or property of like kind and quality.

### J. Loss Payment

We will adjust all losses with you. We will pay you unless some other person is named in the policy or is legally entitled to receive payment. Loss will be payable 60 days after we receive your proof of loss and:

1. Reach an agreement with you;

2. There is an entry of a final judgment; or

3. There is a filing of an appraisal award with us.

### K. Abandonment Of Property

We need not accept any property abandoned by an "insured".

### L. Mortgage Clause

1. If a mortgagee is named in this policy, any loss payable under Coverage **A** or **B** will be paid to the mortgagee and you, as interests appear. If more than one mortgagee is named, the order of payment will be the same as the order of precedence of the mortgages.

2. If we deny your claim, that denial will not apply to a valid claim of the mortgagee, if the mortgagee:

   **a.** Notifies us of any change in ownership, occupancy or substantial change in risk of which the mortgagee is aware;

   **b.** Pays any premium due under this policy on demand if you have neglected to pay the premium; and

   **c.** Submits a signed, sworn statement of loss within 60 days after receiving notice from us of your failure to do so. Paragraphs **F.** Appraisal, **H.** Suit Against Us and **J.** Loss Payment under Section **I** – Conditions also apply to the mortgagee.

3. If we decide to cancel or not to renew this policy, the mortgagee will be notified at least 10 days before the date cancellation or nonrenewal takes effect.

4. If we pay the mortgagee for any loss and deny payment to you:

   **a.** We are subrogated to all the rights of the mortgagee granted under the mortgage on the property; or

   **b.** At our option, we may pay to the mortgagee the whole principal on the mortgage plus any accrued interest. In this event, we will receive a full assignment and transfer of the mortgage and all securities held as collateral to the mortgage debt.

5. Subrogation will not impair the right of the mortgagee to recover the full amount of the mortgagee's claim.

### M. No Benefit To Bailee

We will not recognize any assignment or grant any coverage that benefits a person or organization holding, storing or moving property for a fee regardless of any other provision of this policy.

### N. Nuclear Hazard Clause

1. "Nuclear Hazard" means any nuclear reaction, radiation, or radioactive contamination, all whether controlled or uncontrolled or however caused, or any consequence of any of these.

2. Loss caused by the nuclear hazard will not be considered loss caused by fire, explosion, or smoke, whether these perils are specifically named in or otherwise included within the Perils Insured Against.

3. This policy does not apply under Section **I** to loss caused directly or indirectly by nuclear hazard, except that direct loss by fire resulting from the nuclear hazard is covered.

### O. Recovered Property

If you or we recover any property for which we have made payment under this policy, you or we will notify the other of the recovery. At your option, the property will be returned to or retained by you or it will become our property. If the recovered property is returned to or retained by you, the loss payment will be adjusted based on the amount you received for the recovered property.

### P. Volcanic Eruption Period

One or more volcanic eruptions that occur within a 72-hour period will be considered as one volcanic eruption.

### Q. Policy Period

This policy applies only to loss which occurs during the policy period.

 © Insurance Services Office, Inc., 2010

EXHIBIT C

**R. Concealment Or Fraud**

We provide coverage to no "insureds" under this policy if, whether before or after a loss, an "insured" has:

**1.** Intentionally concealed or misrepresented any material fact or circumstance;

**2.** Engaged in fraudulent conduct; or

**3.** Made false statements;

relating to this insurance.

**S. Loss Payable Clause**

If the Declarations shows a loss payee for certain listed insured personal property, the definition of "insured" is changed to include that loss payee with respect to that property.

If we decide to cancel or not renew this policy, that loss payee will be notified in writing.

## SECTION II – LIABILITY COVERAGES

**A. Coverage E – Personal Liability**

If a claim is made or a suit is brought against an "insured" for damages because of "bodily injury" or "property damage" caused by an "occurrence" to which this coverage applies, we will:

**1.** Pay up to our limit of liability for the damages for which an "insured" is legally liable. Damages include prejudgment interest awarded against an "insured"; and

**2.** Provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent. We may investigate and settle any claim or suit that we decide is appropriate. Our duty to settle or defend ends when our limit of liability for the "occurrence" has been exhausted by payment of a judgment or settlement.

**B. Coverage F – Medical Payments To Others**

We will pay the necessary medical expenses that are incurred or medically ascertained within three years from the date of an accident causing "bodily injury". Medical expenses means reasonable charges for medical, surgical, x-ray, dental, ambulance, hospital, professional nursing, prosthetic devices and funeral services. This coverage does not apply to you or regular residents of your household except "residence employees". As to others, this coverage applies only:

**1.** To a person on the "insured location" with the permission of an "insured"; or

**2.** To a person off the "insured location", if the "bodily injury":

**a.** Arises out of a condition on the "insured location" or the ways immediately adjoining;

**b.** Is caused by the activities of an "insured";

**c.** Is caused by a "residence employee" in the course of the "residence employee's" employment by an "insured"; or

**d.** Is caused by an animal owned by or in the care of an "insured".

## SECTION II – EXCLUSIONS

**A. "Motor Vehicle Liability"**

**1.** Coverages **E** and **F** do not apply to any "motor vehicle liability" if, at the time and place of an "occurrence", the involved "motor vehicle":

**a.** Is registered for use on public roads or property;

**b.** Is not registered for use on public roads or property, but such registration is required by a law, or regulation issued by a government agency, for it to be used at the place of the "occurrence"; or

**c.** Is being:

**(1)** Operated in, or practicing for, any prearranged or organized race, speed contest or other competition;

**(2)** Rented to others;

**(3)** Used to carry persons or cargo for a charge; or

**(4)** Used for any "business" purpose except for a motorized golf cart while on a golfing facility.

**2.** If Exclusion **A.1.** does not apply, there is still no coverage for "motor vehicle liability", unless the "motor vehicle" is:

**a.** In dead storage on an "insured location";

**b.** Used solely to service a residence;

**c.** Designed to assist the handicapped and, at the time of an "occurrence", it is:

**(1)** Being used to assist a handicapped person; or

**(2)** Parked on an "insured location";

**d.** Designed for recreational use off public roads and:

**(1)** Not owned by an "insured"; or

 © Insurance Services Office, Inc., 2010

**EXHIBIT C**

**(2)** Owned by an "insured" provided the "occurrence" takes place:

    **(a)** On an "insured location" as defined in Definition **B.6.a., b., d., e.** or **h.;** or

    **(b)** Off an "insured location" and the "motor vehicle" is:

        **(i)** Designed as a toy vehicle for use by children under seven years of age;

        **(ii)** Powered by one or more batteries; and

        **(iii)** Not built or modified after manufacture to exceed a speed of five miles per hour on level ground;

**e.** A motorized golf cart that is owned by an "insured", designed to carry up to four persons, not built or modified after manufacture to exceed a speed of 25 miles per hour on level ground and, at the time of an "occurrence", is within the legal boundaries of:

    **(1)** A golfing facility and is parked or stored there, or being used by an "insured" to:

        **(a)** Play the game of golf or for other recreational or leisure activity allowed by the facility;

        **(b)** Travel to or from an area where "motor vehicles" or golf carts are parked or stored; or

        **(c)** Cross public roads at designated points to access other parts of the golfing facility; or

    **(2)** A private residential community, including its public roads upon which a motorized golf cart can legally travel, which is subject to the authority of a property owners association and contains an "insured's" residence.

## B. "Watercraft Liability"

**1.** Coverages **E** and **F** do not apply to any "watercraft liability" if, at the time of an "occurrence", the involved watercraft is being:

**a.** Operated in, or practicing for, any prearranged or organized race, speed contest or other competition. This exclusion does not apply to a sailing vessel or a predicted log cruise;

**b.** Rented to others;

**c.** Used to carry persons or cargo for a charge; or

**d.** Used for any "business" purpose.

**2.** If Exclusion **B.1.** does not apply, there is still no coverage for "watercraft liability" unless, at the time of the "occurrence", the watercraft:

**a.** Is stored;

**b.** Is a sailing vessel, with or without auxiliary power, that is:

    **(1)** Less than 26 feet in overall length; or

    **(2)** 26 feet or more in overall length and not owned by or rented to an "insured"; or

**c.** Is not a sailing vessel and is powered by:

    **(1)** An inboard or inboard-outdrive engine or motor, including those that power a water jet pump, of:

        **(a)** 50 horsepower or less and not owned by an "insured"; or

        **(b)** More than 50 horsepower and not owned by or rented to an "insured";

    **(2)** One or more outboard engines or motors with:

        **(a)** 25 total horsepower or less;

        **(b)** More than 25 horsepower if the outboard engine or motor is not owned by an "insured";

        **(c)** More than 25 horsepower if the outboard engine or motor is owned by an "insured" who acquired it during the policy period; or

        **(d)** More than 25 horsepower if the outboard engine or motor is owned by an "insured" who acquired it before the policy period, but only if:

            **(i)** You declare them at policy inception; or

            **(ii)** Your intent to insure them is reported to us in writing within 45 days after you acquire them.

The coverages in **(c)** and **(d)** above apply for the policy period.

Horsepower means the maximum power rating assigned to the engine or motor by the manufacturer.

## C. "Aircraft Liability"

This policy does not cover "aircraft liability".

## D. "Hovercraft Liability"

This policy does not cover "hovercraft liability".

© Insurance Services Office, Inc., 2010

EXHIBIT C

**E. Coverage E – Personal Liability And Coverage F – Medical Payments To Others**

Coverages **E** and **F** do not apply to the following:

**1. Expected Or Intended Injury**

"Bodily injury" or "property damage" which is expected or intended by an "insured", even if the resulting "bodily injury" or "property damage":

**a.** Is of a different kind, quality or degree than initially expected or intended; or

**b.** Is sustained by a different person, entity or property than initially expected or intended.

However, this Exclusion **E.1.** does not apply to "bodily injury" or "property damage" resulting from the use of reasonable force by an "insured" to protect persons or property;

**2. "Business"**

**a.** "Bodily injury" or "property damage" arising out of or in connection with a "business" conducted from an "insured location" or engaged in by an "insured", whether or not the "business" is owned or operated by an "insured" or employs an "insured".

This Exclusion **E.2.** applies but is not limited to an act or omission, regardless of its nature or circumstance, involving a service or duty rendered, promised, owed, or implied to be provided because of the nature of the "business".

**b.** This Exclusion **E.2.** does not apply to:

**(1)** The rental or holding for rental of an "insured location";

**(a)** On an occasional basis if used only as a residence;

**(b)** In part for use only as a residence, unless a single-family unit is intended for use by the occupying family to lodge more than two roomers or boarders; or

**(c)** In part, as an office, school, studio or private garage; and

**(2)** An "insured" under the age of 21 years involved in a part-time or occasional, self-employed "business" with no employees.

**3. Professional Services**

"Bodily injury" or "property damage" arising out of the rendering of or failure to render professional services;

**4. "Insured's" Premises Not An "Insured Location"**

"Bodily injury" or "property damage" arising out of a premises:

**a.** Owned by an "insured";

**b.** Rented to an "insured"; or

**c.** Rented to others by an "insured";

that is not an "insured location";

**5. War**

"Bodily injury" or "property damage" caused directly or indirectly by war, including the following and any consequence of any of the following:

**a.** Undeclared war, civil war, insurrection, rebellion or revolution;

**b.** Warlike act by a military force or military personnel; or

**c.** Destruction, seizure or use for a military purpose.

Discharge of a nuclear weapon will be deemed a warlike act even if accidental;

**6. Communicable Disease**

"Bodily injury" or "property damage" which arises out of the transmission of a communicable disease by an "insured";

**7. Sexual Molestation, Corporal Punishment Or Physical Or Mental Abuse**

"Bodily injury" or "property damage" arising out of sexual molestation, corporal punishment or physical or mental abuse; or

**8. Controlled Substance**

"Bodily injury" or "property damage" arising out of the use, sale, manufacture, delivery, transfer or possession by any person of a Controlled Substance as defined by the Federal Food and Drug Law at 21 U.S.C.A. Sections 811 and 812. Controlled Substances include but are not limited to cocaine, LSD, marijuana and all narcotic drugs. However, this exclusion does not apply to the legitimate use of prescription drugs by a person following the lawful orders of a licensed health care professional.

Exclusions **A.** "Motor Vehicle Liability", **B.** "Watercraft Liability", **C.** "Aircraft Liability", **D.** "Hovercraft Liability" and **E.4.** "Insured's" Premises Not An "Insured Location" do not apply to "bodily injury" to a "residence employee" arising out of and in the course of the "residence employee's" employment by an "insured".

 © Insurance Services Office, Inc., 2010

EXHIBIT C

**F. Coverage E – Personal Liability**

Coverage **E** does not apply to:

**1.** Liability:

    **a.** For any loss assessment charged against you as a member of an association, corporation or community of property owners, except as provided in **D.** Loss Assessment under Section **II – Additional Coverages;**

    **b.** Under any contract or agreement entered into by an "insured". However, this exclusion does not apply to written contracts:

        **(1)** That directly relate to the ownership, maintenance or use of an "insured location"; or

        **(2)** Where the liability of others is assumed by you prior to an "occurrence";

    unless excluded in **a.** above or elsewhere in this policy;

**2.** "Property damage" to property owned by an "insured". This includes costs or expenses incurred by an "insured" or others to repair, replace, enhance, restore or maintain such property to prevent injury to a person or damage to property of others, whether on or away from an "insured location";

**3.** "Property damage" to property rented to, occupied or used by or in the care of an "insured". This exclusion does not apply to "property damage" caused by fire, smoke or explosion;

**4.** "Bodily injury" to any person eligible to receive any benefits voluntarily provided or required to be provided by an "insured" under any:

    **a.** Workers' compensation law;

    **b.** Non-occupational disability law; or

    **c.** Occupational disease law;

**5.** "Bodily injury" or "property damage" for which an "insured" under this policy:

    **a.** Is also an insured under a nuclear energy liability policy issued by the:

        **(1)** Nuclear Energy Liability Insurance Association;

        **(2)** Mutual Atomic Energy Liability Underwriters;

        **(3)** Nuclear Insurance Association of Canada;

    or any of their successors; or

    **b.** Would be an insured under such a policy but for the exhaustion of its limit of liability; or

**6.** "Bodily injury" to you or an "insured" as defined under Definition **5.a.** or **b.**

This exclusion also applies to any claim made or suit brought against you or an "insured" to:

    **a.** Repay; or

    **b.** Share damages with;

another person who may be obligated to pay damages because of "bodily injury" to an "insured".

**G. Coverage F – Medical Payments To Others**

Coverage **F** does not apply to "bodily injury":

**1.** To a "residence employee" if the "bodily injury":

    **a.** Occurs off the "insured location"; and

    **b.** Does not arise out of or in the course of the "residence employee's" employment by an "insured";

**2.** To any person eligible to receive benefits voluntarily provided or required to be provided under any:

    **a.** Workers' compensation law;

    **b.** Non-occupational disability law; or

    **c.** Occupational disease law;

**3.** From any:

    **a.** Nuclear reaction;

    **b.** Nuclear radiation; or

    **c.** Radioactive contamination;

all whether controlled or uncontrolled or however caused; or

    **d.** Any consequence of any of these; or

**4.** To any person, other than a "residence employee" of an "insured", regularly residing on any part of the "insured location".

**SECTION II – ADDITIONAL COVERAGES**

We cover the following in addition to the limits of liability:

**A. Claim Expenses**

We pay:

**1.** Expenses we incur and costs taxed against an "insured" in any suit we defend;

**2.** Premiums on bonds required in a suit we defend, but not for bond amounts more than the Coverage **E** limit of liability. We need not apply for or furnish any bond;

EXHIBIT C

3. Reasonable expenses incurred by an "insured" at our request, including actual loss of earnings (but not loss of other income) up to $250 per day, for assisting us in the investigation or defense of a claim or suit; and

4. Interest on the entire judgment which accrues after entry of the judgment and before we pay or tender, or deposit in court that part of the judgment which does not exceed the limit of liability that applies.

## B. First Aid Expenses

We will pay expenses for first aid to others incurred by an "insured" for "bodily injury" covered under this policy. We will not pay for first aid to an "insured".

## C. Damage To Property Of Others

1. We will pay, at replacement cost, up to $1,000 per "occurrence" for "property damage" to property of others caused by an "insured".

2. We will not pay for "property damage":

   a. To the extent of any amount recoverable under Section I;

   b. Caused intentionally by an "insured" who is 13 years of age or older;

   c. To property owned by an "insured";

   d. To property owned by or rented to a tenant of an "insured" or a resident in your household; or

   e. Arising out of:

      (1) A "business" engaged in by an "insured";

      (2) Any act or omission in connection with a premises owned, rented or controlled by an "insured", other than the "insured location"; or

      (3) The ownership, maintenance, occupancy, operation, use, loading or unloading of aircraft, hovercraft, watercraft or "motor vehicles".

      This Exclusion e.(3) does not apply to a "motor vehicle" that:

      (a) Is designed for recreational use off public roads;

      (b) Is not owned by an "insured"; and

      (c) At the time of the "occurrence", is not required by law, or regulation issued by a government agency, to have been registered for it to be used on public roads or property.

## D. Loss Assessment

1. We will pay up to $1,000 for your share of loss assessment charged against you, as owner or tenant of the "residence premises", during the policy period by a corporation or association of property owners, when the assessment is made as a result of:

   a. "Bodily injury" or "property damage" not excluded from coverage under Section II – Exclusions; or

   b. Liability for an act of a director, officer or trustee in the capacity as a director, officer or trustee, provided such person:

      (1) Is elected by the members of a corporation or association of property owners; and

      (2) Serves without deriving any income from the exercise of duties which are solely on behalf of a corporation or association of property owners.

2. Paragraph I. Policy Period under Section II – Conditions does not apply to this Loss Assessment Coverage.

3. Regardless of the number of assessments, the limit of $1,000 is the most we will pay for loss arising out of:

   a. One accident, including continuous or repeated exposure to substantially the same general harmful condition; or

   b. A covered act of a director, officer or trustee. An act involving more than one director, officer or trustee is considered to be a single act.

4. We do not cover assessments charged against you or a corporation or association of property owners by any governmental body.

## SECTION II – CONDITIONS

## A. Limit Of Liability

Our total liability under Coverage **E** for all damages resulting from any one "occurrence" will not be more than the Coverage **E** Limit Of Liability shown in the Declarations. This limit is the same regardless of the number of "insureds", claims made or persons injured. All "bodily injury" and "property damage" resulting from any one accident or from continuous or repeated exposure to substantially the same general harmful conditions shall be considered to be the result of one "occurrence".

 © Insurance Services Office, Inc., 2010 **EXHIBIT C**

Our total liability under Coverage **F** for all medical expense payable for "bodily injury" to one person as the result of one accident will not be more than the Coverage **F** Limit Of Liability shown in the Declarations.

**B. Severability Of Insurance**

This insurance applies separately to each "insured". This condition will not increase our limit of liability for any one "occurrence".

**C. Duties After "Occurrence"**

In case of an "occurrence", you or another "insured" will perform the following duties that apply. We have no duty to provide coverage under this policy if your failure to comply with the following duties is prejudicial to us. You will help us by seeing that these duties are performed:

**1.** Give written notice to us or our agent as soon as is practical, which sets forth:

   **a.** The identity of the policy and the "named insured" shown in the Declarations;

   **b.** Reasonably available information on the time, place and circumstances of the "occurrence"; and

   **c.** Names and addresses of any claimants and witnesses;

**2.** Cooperate with us in the investigation, settlement or defense of any claim or suit;

**3.** Promptly forward to us every notice, demand, summons or other process relating to the "occurrence";

**4.** At our request, help us:

   **a.** To make settlement;

   **b.** To enforce any right of contribution or indemnity against any person or organization who may be liable to an "insured";

   **c.** With the conduct of suits and attend hearings and trials; and

   **d.** To secure and give evidence and obtain the attendance of witnesses;

**5.** With respect to **C.** Damage To Property Of Others under Section **II** – Additional Coverages, submit to us within 60 days after the loss a sworn statement of loss and show the damaged property, if in an "insured's" control;

**6.** No "insured" shall, except at such "insured's" own cost, voluntarily make payment, assume obligation or incur expense other than for first aid to others at the time of the "bodily injury".

**D. Duties Of An Injured Person – Coverage F – Medical Payments To Others**

**1.** The injured person or someone acting for the injured person will:

   **a.** Give us written proof of claim, under oath if required, as soon as is practical; and

   **b.** Authorize us to obtain copies of medical reports and records.

**2.** The injured person will submit to a physical exam by a doctor of our choice when and as often as we reasonably require.

**E. Payment Of Claim – Coverage F – Medical Payments To Others**

Payment under this coverage is not an admission of liability by an "insured" or us.

**F. Suit Against Us**

**1.** No action can be brought against us unless there has been full compliance with all of the terms under this Section **II.**

**2.** No one will have the right to join us as a party to any action against an "insured".

**3.** Also, no action with respect to Coverage **E** can be brought against us until the obligation of such "insured" has been determined by final judgment or agreement signed by us.

**G. Bankruptcy Of An "Insured"**

Bankruptcy or insolvency of an "insured" will not relieve us of our obligations under this policy.

**H. Other Insurance**

This insurance is excess over other valid and collectible insurance except insurance written specifically to cover as excess over the limits of liability that apply in this policy.

**I. Policy Period**

This policy applies only to "bodily injury" or "property damage" which occurs during the policy period.

**J. Concealment Or Fraud**

We do not provide coverage to an "insured" who, whether before or after a loss, has:

**1.** Intentionally concealed or misrepresented any material fact or circumstance;

**2.** Engaged in fraudulent conduct; or

**3.** Made false statements;

relating to this insurance.

EXHIBIT C

# SECTIONS I AND II – CONDITIONS

## A. Liberalization Clause

If we make a change which broadens coverage under this edition of our policy without additional premium charge, that change will automatically apply to your insurance as of the date we implement the change in your state, provided that this implementation date falls within 60 days prior to or during the policy period stated in the Declarations.

This Liberalization Clause does not apply to changes implemented with a general program revision that includes both broadenings and restrictions in coverage, whether that general program revision is implemented through introduction of:

**1.** A subsequent edition of this policy; or

**2.** An amendatory endorsement.

## B. Waiver Or Change Of Policy Provisions

A waiver or change of a provision of this policy must be in writing by us to be valid. Our request for an appraisal or examination will not waive any of our rights.

## C. Cancellation

**1.** You may cancel this policy at any time by returning it to us or by letting us know in writing of the date cancellation is to take effect.

**2.** We may cancel this policy only for the reasons stated below by letting you know in writing of the date cancellation takes effect. This cancellation notice may be delivered to you, or mailed to you at your mailing address shown in the Declarations. Proof of mailing will be sufficient proof of notice.

    **a.** When you have not paid the premium, we may cancel at any time by letting you know at least 10 days before the date cancellation takes effect.

    **b.** When this policy has been in effect for less than 60 days and is not a renewal with us, we may cancel for any reason by letting you know at least 10 days before the date cancellation takes effect.

    **c.** When this policy has been in effect for 60 days or more, or at any time if it is a renewal with us, we may cancel:

        **(1)** If there has been a material misrepresentation of fact which if known to us would have caused us not to issue the policy; or

        **(2)** If the risk has changed substantially since the policy was issued.

        This can be done by letting you know at least 30 days before the date cancellation takes effect.

    **d.** When this policy is written for a period of more than one year, we may cancel for any reason at anniversary by letting you know at least 30 days before the date cancellation takes effect.

**3.** When this policy is canceled, the premium for the period from the date of cancellation to the expiration date will be refunded pro rata.

**4.** If the return premium is not refunded with the notice of cancellation or when this policy is returned to us, we will refund it within a reasonable time after the date cancellation takes effect.

## D. Nonrenewal

We may elect not to renew this policy. We may do so by delivering to you, or mailing to you at your mailing address shown in the Declarations, written notice at least 30 days before the expiration date of this policy. Proof of mailing will be sufficient proof of notice.

## E. Assignment

Assignment of this policy will not be valid unless we give our written consent.

## F. Subrogation

An "insured" may waive in writing before a loss all rights of recovery against any person. If not waived, we may require an assignment of rights of recovery for a loss to the extent that payment is made by us.

If an assignment is sought, an "insured" must sign and deliver all related papers and cooperate with us.

Subrogation does not apply to Coverage **F** or Paragraph **C.** Damage To Property Of Others under Section **II** – Additional Coverages.

## G. Death

If any person named in the Declarations or the spouse, if a resident of the same household, dies, the following apply:

**1.** We insure the legal representative of the deceased but only with respect to the premises and property of the deceased covered under the policy at the time of death; and

 © Insurance Services Office, Inc., 2010

EXHIBIT C

**2.** "Insured" includes:

    **a.** An "insured" who is a member of your household at the time of your death, but only while a resident of the "residence premises"; and

    **b.** With respect to your property, the person having proper temporary custody of the property until appointment and qualification of a legal representative.

© Insurance Services Office, Inc., 2010

**EXHIBIT C**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# GUARANTEED REPLACEMENT COST

To the extent that coverage is provided, we agree to amend the present limits of liability in accordance with the following provisions:

**A.** If you have:

1. Agreed to allow us to adjust the **Coverage A – Dwelling** limit of insurance stated in the Declarations Page and the premium in accordance with:

    **a.** The property evaluation made by us; and

    **b.** Any increases in inflation; and

2. You are required to notify us, within 30 days of completion, of any alterations, additions, or improvements to your dwelling if the resulting increase in the replacement of the dwelling is 5% or more of the Building Limit of Liability.

    The provisions of this endorsement will apply after a loss, provided you elect to repair or replace your dwelling.

**B.** If there is a loss to the dwelling that exceeds **Coverage A – Dwelling** limit of liability shown in the Declarations Page, with respect to any building covered under this policy:

1. We will increase the **Coverage A – Dwelling** limit of liability to equal the current replacement cost of the dwelling.

2. As respects Coverage A- Dwelling only and for the purpose of settling Coverage A losses only, **Section 1 Conditions, Item D.- Loss Settlement, paragraphs 2. a. through 2. e.** are deleted and replaced as follows:

    2. Building under **Coverage A – Dwelling** at replacement cost without deduction for depreciation.

        a. We will pay no more than the smallest of the following amounts for like use on the same premises:

            (1) The replacement cost of that part of the building damaged or destroyed;

            (2) The necessary amount actually spent to repair or replace the building damaged or   destroyed; or

            (3) The limit of liability under this policy that applies to the building, increased according to paragraph **B.1** of this endorsement.

            If the building is rebuilt at a new premises, the cost described in **2.** is limited to the cost which would have been incurred if the building had been rebuilt at the original premises.

        b. We will pay no more than the actual cash value of the damage until actual repair or replacement is complete.

        c.  You may disregard the replacement cost loss settlement provisions and make a claim under this policy for loss or damage to buildings on an actual cash value basis. You may then make a claim within 180 days after loss for any additional liability on a replacement cost basis.

This endorsement does not apply to land, including land on which the covered dwelling or other structures are located. All other policy terms and conditions apply.

 © Insurance Company, 2017
Includes copyrighted material of ISO Properties, Inc.
used with permission

Exhibit C

HOMEOWNERS
HO 06 48 10 15

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# RESIDENCE PREMISES
# DEFINITION ENDORSEMENT

**DEFINITIONS**

Definition **B.11.** is replaced by the following:

**11.** "Residence premises" means:

   **a.** The one-family dwelling where you reside;

   **b.** The two-, three- or four-family dwelling where you reside in at least one of the family units; or

   **c.** That part of any other building where you reside;

on the inception date of the policy period shown in the Declarations and which is shown as the "residence premises" in the Declarations.

"Residence premises" also includes other structures and grounds at that location.

All other provisions of this Policy apply.

© Insurance Services Office, Inc., 2015
**EXHIBIT C**

HOMEOWNERS
HO 03 12 05 11

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# WINDSTORM OR HAIL PERCENTAGE DEDUCTIBLE

**SCHEDULE**

| |
|---|
| **Windstorm Or Hail Deductible Percentage Amount:** As per the Homeowners Policy Declarations |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

**SECTION I – CONDITIONS**

**B. Deductible**

The follo wing sp ecial de ductible i s  added to th e policy:

With respect to the peril of Wind storm Or Hail, fo r any one loss, we  will pay only that part of the total of all lo ss payable that  exceeds the windstorm or hail percentage deductible.

The doll ar  amount of t he win dstorm or hail deductible i s dete rmined by multi plying the Coverage **A**  Limit Of   Liability shown in the Declarations by the ded uctible percentage amount shown in the Schedule above.

No  other d eductible in  th e poli cy a pplies to  lo ss caused by windstorm or hail.

All other provisions of this policy apply.

EXHIBIT C

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# PERSONAL PROPERTY REPLACEMENT COST
# LOSS SETTLEMENT – TEXAS

**A. Eligible Property**

1. Covered losses to the following property are settled at replacement cost at the time of the loss:

   a. Coverage **C;** and

   b. If covered in this policy:

      (1) Awnings, outdoor antennas and outdoor equipment; and

      (2) Carpeting and household appliances;

      whether or not attached to buildings.

2. This method of loss settlement will also apply to the following articles or classes of property if they are separately described and specifically insured in this policy and not subject to agreed value loss settlement:

   a. Furs and garments:

      (1) Trimmed with fur; or

      (2) Consisting principally of fur;

   b. Cameras, projection machines, films and related articles of equipment;

   c. Musical equipment and related articles of equipment;

   d. Silverware, silver-plated ware, goldware, gold-plated ware and pewterware, but excluding:

      (1) Pens or pencils;

      (2) Flasks;

      (3) Smoking implements; or

      (4) Jewelry; and

   e. Golfer's equipment meaning golf clubs, golf clothing and golf equipment.

   Personal Property Replacement Cost loss settlement will not apply to other classes of property separately described and specifically insured.

**B. Ineligible Property**

   Property listed below is not eligible for replacement cost loss settlement. Any loss will be settled at actual cash value at the time of loss but not more than the amount required to repair or replace.

1. Antiques, fine arts, paintings and similar articles of rarity or antiquity, which cannot be replaced.

2. Memorabilia, souvenirs, collectors items and similar articles, whose age or history contribute to their value.

3. Articles not maintained in good or workable condition.

4. **We will not pay** replacement cost for property that is outdated or obsolete and stored or not being used.

**C. Replacement Cost Loss Settlement Condition**

   The following loss settlement condition applies to all property described in **A.** above:

1. We will pay no more than the least of the following amounts:

   a. Replacement cost at the time of loss without deduction for depreciation;

   b. The full cost of repair at the time of loss;

   c. The limit of liability that applies to Coverage **C,** if applicable;

   d. Any applicable special limits of liability stated in this policy; or

   e. For loss to any item described in **A.2.a. – e.** above, the limit of liability that applies to the item.

2. If the cost to repair or replace the property described in **A.** above is more than $500, we will pay no more than the actual cash value for the loss until the actual repair or replacement is complete.

3. You may make a claim for loss on an actual cash value basis and then make a claim for any additional liability in accordance with this endorsement provided you notify us, within 180 days after the date of loss, of your intent to repair or replace the damaged property.

All other provisions of this policy apply.

**EXHIBIT C**

POLICY NUMBER:

HOMEOWNERS
HO 04 69 01 14

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# LIMITED WATER BACK-UP AND SUMP DISCHARGE OR OVERFLOW COVERAGE – TEXAS

### SCHEDULE

| Limited Water Back-up And Sump Discharge Or Overflow Coverage Limit Of Liability: | $ |
| --- | --- |

| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |
| --- |

**A. Section I – Property Coverages**

**E  Additional Coverages**

The following coverage is added:

**Limited Water Back-up And Sump Discharge Or Overflow Coverage**

We will pay up to the Limit Of Liability shown in the Schedule for direct physical loss, not caused by the negligence of an "insured", to property covered under Section **I** caused by water, or waterborne material, which:

**1.** Originates from within the dwelling where you reside and backs up through sewers or drains; or

**2.** Overflows or is discharged from a:

**a.** Sump, sump pump; or

**b.** Related equipment;

even if such overflow or discharge results from mechanical breakdown or power failure. This coverage does not apply to direct physical loss of the sump pump, or related equipment, which is caused by mechanical breakdown or power failure.

This coverage does not increase the limits of liability for Coverage **A, B, C** or **D** stated in the Declarations.

**B. Section I – Perils Insured Against**

With respect to the coverage provided under this endorsement, Paragraphs:

**A.2.c.(6)(b)** in Form **HO 00 03;**

**A.2.e.(2)** in Form **HO 00 05;**

**2.j.(2)** in Endorsement **HO 05 61;**

**3.j.(2)** in Endorsement **HO 17 90;** and

**2.c.(6)(b)** in Endorsement **HO 17 91;**

are replaced by the following:

Latent defect, inherent vice or any quality in property that causes it to damage or destroy itself;

**C. Section I – Exclusions**

With respect to the coverage provided under this endorsement:

**1.** The **Water** Exclusion is replaced by the following:

**Water**

This means water which backs up through sewers or drains, or overflows or is discharged from a sump, sump pump or related equipment, as a direct or indirect result of:

**a.** Flood, surface water, waves, including tidal wave and tsunami, tides, tidal water, overflow of any body of water, or spray from any of these, all whether or not driven by wind, including storm surge;

**b.** Water below the surface of the ground, including water which exerts pressure on, or seeps, leaks or flows through a building, sidewalk, driveway, patio, foundation, swimming pool or other structure; or

**c.** Waterborne material carried or otherwise moved by any of the water referred to in Paragraphs **C.1.a.** and **C.1.b.** of this exclusion.

This exclusion applies regardless of whether any of the above, in Paragraphs **C.1.a.** through **C.1.c.,** is caused by an act of nature or is otherwise caused.

This exclusion applies to, but is not limited to, escape, overflow or discharge, for any reason, of water or waterborne material from a dam, levee, seawall or any other boundary or containment system.

However, direct loss by fire, explosion or theft resulting from any of the above, in Paragraphs **C.1.a.** through **C.1.c.,** is covered.

**2.** The **Power Failure** Exclusion does not apply.

All other provisions of this policy apply.

© Insurance Services Office, Inc., 2013

EXHIBIT C

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# SPECIAL PROVISIONS – TEXAS

## DEFINITIONS

The following are added to Paragraph **B.:**

**12.** "Fungi" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

**13.** "Business day" means a day other than a Saturday, Sunday or holiday recognized by the state of Texas.

**14.** "Pollutants" - means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

Where used in this policy, the term pollutant does not include the following:

**a.** Loss caused by pollutants that escape from heating and air conditioning systems and appliances (HVAC);

**b.** Loss caused by common household chemicals used to maintain the residence premises.

**c.** Loss caused by pollutants released from a hostile fire. A hostile fire is a fire which becomes uncontrollable or breaks out from where it was intended to be."

## SECTION I – PROPERTY COVERAGES

For Form **HO 00 05,** Paragraph **E.10.k.(2)(d)** is replaced by the following:

**(d)** Caused by constant or repeated seepage or leakage of water or steam or the presence or condensation of humidity, moisture or vapor, over a period of weeks, months or years.

For all forms except **HO 00 08,** the following is added to Paragraph **E.11. Ordinance Or Law:**

**d.** If the insured property is located in an area which is eligible for coverage through the Texas Windstorm Insurance Association, the coverage described above also applies to the increased cost you incur due to the repair, replacement or demolition required for the dwelling to comply with the building specifications contained in the Texas Windstorm Insurance Association's plan of operation.

(This is Paragraph **C.11.** in Form **HO 00 04** and **D.10.** in Form **HO 00 06.**)

## SECTION I – PERILS INSURED AGAINST

For Forms **HO 00 02** and **HO 00 06,** Paragraph **12.b.(5)** is replaced by the following:

**(5)** Caused by constant or repeated seepage or leakage of water or steam or the presence or condensation of humidity, moisture or vapor, over a period of weeks, months or years.

**For Form** HO 00 04, **Paragraph** 12.b.(4) **is replaced by the following:**

**(4)** Caused by constant or repeated seepage or leakage of water or steam or the presence or condensation of humidity, moisture or vapor, over a period of weeks, months or years.

For Form HO 00 03:

Paragraph **A.2.c.(5)** is replaced by the following:

**(5)** Constant or repeated seepage or leakage of water or steam or the presence or condensation of humidity, moisture or vapor, over a period of weeks, months or years from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system, or from within a household appliance.

Paragraph **A.2.c.(6)(c)** is replaced by the following:

**(c)** Smog, rust or other corrosion, wet or dry rot;

Paragraph **B.12.b.(4)** is replaced by the following:

**(4)** Caused by constant or repeated seepage or leakage of water or steam or the presence or condensation of humidity, moisture or vapor, over a period of weeks, months or years.

**EXHIBIT C**

For Form **HO 00 05**:

Paragraph **A.2.d.** is replaced by the following:

    **d.** Constant or repeated seepage or leakage of water or steam or the presence or condensation of humidity, moisture or vapor, over a period of weeks, months or years from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system, or from within a household appliance.

Paragraph **A.2.e.(3)** is replaced by the following:

    **(3)** Smog, rust or other corrosion, wet or dry rot;

## SECTION I – EXCLUSIONS

Paragraph **8. Intentional Loss** is replaced by the following:

**8. Intentional Loss**

    **a.** Intentional Loss means any loss arising out of any act an "insured" commits or conspires to commit with the intent to cause a loss.

    In the event of such loss, no "insured" is entitled to coverage, even "insureds" who did not commit or conspire to commit the act causing the loss.

    **b.** However, this exclusion does not apply to an "insured" who did not cooperate in or contribute to the creation of the loss if that "insured" has:

        **(1)** Filed a police report; and

        **(2)** Cooperated with law enforcement investigation or prosecution relating to any other "insured" causing the intentional loss.

    **c.** If we pay a claim pursuant to Paragraph **8.b.,** our payment to the "insured" is limited to that "insured's" insurable interest in the property less any payments we first made to a mortgagee or other party with a secured interest in the Policy. In no event will we pay more than the limit of liability. As a condition of payment for intentional loss caused by another "insured" under this exception to the exclusion, we may require an assignment of rights of recovery to the extent that payment is made by us.

The following exclusion is added:

**10. "Fungi" Or Microbes**

    **a.** "Fungi" or microbes means the presence, growth, proliferation, spread or any activity of "fungi" or microbes.

    This exclusion also applies to the cost:

        **(1)** To remove "fungi" or microbes from property covered under Section I – Property Coverages;

        **(2)** To tear out and replace any part of the building or other covered property as needed to gain access to the "fungi" or microbes; and

        **(3)** Of testing of air or property to confirm the absence, presence or level of "fungi" or microbes.

    **b.** Exclusion **10.a.** applies unless the "fungi" or microbes are located upon the portion of covered property which must be repaired or replaced because of direct physical damage resulting from any peril which would otherwise be covered under this Policy. For purposes of this exclusion, sudden and accidental shall include a loss event that is hidden or concealed for a period of time until it is detectable. A hidden loss must be reported to us no later than 30 days after the date it was detected or should have been detected.

    **c.** However, the exception to the exclusion described in **10.b.** does not include:

        **(1)** The cost to treat, contain, remove or dispose of the "fungi" or microbes beyond that which is required to repair or replace the covered property physically damaged by water;

        **(2)** The cost of any testing of air or property to confirm the absence, presence or level of "fungi" or microbes whether performed prior to, during or after removal, repair, restoration or replacement;

        **(3)** The cost of any decontamination of the "residence premises"; and

        **(4)** Any increase in loss under Coverage **D –** Loss Of Use and Additional Coverage **1.** Debris Removal resulting from **c.(1), (2)** or **(3).**

    Direct loss by fire, smoke or explosion resulting from "fungi" or microbes is covered.

(This is Paragraph **A.10.** in Forms **HO 00 03** and **HO 00 05.**)

## SECTION I – CONDITIONS

The following is added to Paragraph **A. Insurable Interest And Limit Of Liability:**

**Policy A Liquidated Demand**

    A fire insurance policy, in case of a total loss by fire of property insured, shall be held and considered to be a liquidated demand against the company for the full amount of such policy. This provision shall not apply to personal property.

**Page 2 of 7**    Includes copyrighted material of Insurance Services Office, Inc., with its permission    **HO TX 01 42 07 17**

**EXHIBIT C**

Paragraph **C. Duties After Loss** is replaced by the following:

## C. Duties After Loss

### 1. Your Duties After Loss

In case of a loss to covered property, we have no duty to provide coverage under this Policy if the failure to comply with the following duties is prejudicial to us. These duties must be performed either by you, an "insured" seeking coverage or a representative of either:

**a.** Give prompt notice to us or our agent. With respect to loss caused by windstorm or hail in the catastrophe area, as defined by the Texas Insurance Code, any claim must be filed with us not later than one year after the date of the loss that is the subject of the claim. However, any such claim may be filed after the first anniversary of the date of the loss for good cause shown by the person filing the claim;

**b.** Notify the police in case of a loss by theft;

**c.** Notify the credit card or electronic fund transfer card or access device company in case of loss as provided for in **E.6.** Credit Card, Electronic Fund Transfer Card Or Access Device, Forgery And Counterfeit Money Coverage under Section **I** – Property Coverages;

**d.** Protect the property from further damage. If repairs to the property are required, you must:

  **(1)** Make reasonable and necessary repairs to protect the property; and

  **(2)** Keep an accurate record of repair expenses;

**e.** Cooperate with us in the investigation of a claim;

**f.** Prepare an inventory of damaged personal property showing the quantity, description, actual cash value and amount of loss. Attach all bills, receipts and related documents that justify the figures in the inventory;

**g.** As often as we reasonably require:

  **(1)** Show the damaged property;

  **(2)** Provide us with records and documents we request and permit us to make copies; and

  **(3)** Submit to examination under oath (for minors, a parent or guardian may be present), while not in the presence of another "insured", and sign the same;

**h.** Send to us, within 91 days after our request, your signed, sworn proof of loss on a standard form supplied by us. We must request a signed, sworn proof of loss within 15 days after we receive your written notice, or we waive our right to require a proof of loss. Such waiver will not waive our other rights under this Policy.

  **(1)** This proof of loss shall set forth, to the best of your knowledge and belief:

    **(a)** The time and cause of loss;

    **(b)** The interests of all "insureds" and all others in the property involved and all liens on the property;

    **(c)** Other insurance which may cover the loss;

    **(d)** Changes in the title or occupancy of the property during the term of the Policy;

    **(e)** Specifications of the damaged buildings and detailed repair estimates;

    **(f)** The inventory of damaged personal property described in **C.1.f.** above;

    **(g)** Receipts for additional living expenses incurred and records that support the fair rental value loss; and

    **(h)** Evidence or affidavit that supports a claim under **E.6.** Credit Card, Electronic Fund Transfer Card Or Access Device, Forgery And Counterfeit Money Coverage under Section **I** – Property Coverages, stating the amount and cause of loss.

  **(2)** If you elect to make claim under the Replacement Cost Coverage of this Policy, this proof of loss shall also state, to the best of your knowledge and belief:

    **(a)** The replacement cost of the described dwelling;

    **(b)** The replacement cost of any other building on which loss is claimed; or

    **(c)** The full cost of repair or replacement of loss without deduction for depreciation.

### 2. Our Duties After Loss

**a.** No later than 15 days after we receive your written notice of claim, we must:

  **(1)** Acknowledge receipt of the claim.

EXHIBIT C

If our acknowledgment of the claim is not in writing, we will keep a record of the date, means and content of our acknowledgment;

(2) Begin an investigation of the claim; and

(3) Specify the information you must provide in accordance with Paragraph **C.1.** Your Duties After Loss above.

We may request more information if during the investigation of the claim such additional information is necessary;

b. After we receive the information we request, we must notify you in writing whether the claim will be paid or has been denied or whether more information is needed:

(1) Within 15 "business days"; or

(2) Within 30 days if we have reason to believe the loss resulted from arson;

c. If we do not approve payment of your claim or require more time for processing your claim, we must:

(1) Give the reason for denying your claim; or

(2) Give the reasons we require more time to process your claim. But we must either approve or deny your claim within 45 days after requesting more time.

For Forms **HO 00 02, HO 00 03** and **HO 00 05,** Paragraph **D.1.** in **Loss Settlement** is replaced by the following:

1. Property of the following types:

a. Personal property other than jewelry;

b. Awnings, carpeting, household appliances, outdoor antennas and outdoor equipment, whether or not attached to buildings;

c. Structures that are not buildings; and

d. Grave markers, including mausoleums;

at actual cash value at the time of loss but not more than the amount required to repair or replace.

For Form **HO 00 04,** Paragraph **D. Loss Settlement** is replaced by the following:

**D. Loss Settlement**

1. Covered property losses other than jewelry are settled at actual cash value at the time of loss but not more than the amount required to repair or replace.

2. Jewelry losses are settled at replacement cost at the time of loss without deduction for depreciation.

For Form **HO 00 06,** Paragraph **D.1.** in **Loss Settlement** is replaced by the following:

1. Personal property and grave markers, including mausoleums, at actual cash value at the time of loss but not more than the amount required to repair or replace. This does not include loss to jewelry.

For Form **HO 00 08,** Paragraph **D.1.** in **Loss Settlement** is replaced by the following:

1. Property of the following types:

a. Personal property other than jewelry;

b. Awnings, carpeting, household appliances, outdoor antennas and outdoor equipment, whether or not attached to buildings; and

c. Structures that are not buildings;

at actual cash value at the time of loss but not more than the amount required to repair or replace.

For all forms except **HO 00 04,** Paragraph **3.** is added to **D. Loss Settlement:**

3. Jewelry at replacement cost at the time of loss without deduction for depreciation.

Paragraph **E. Loss To A Pair Or Set** is replaced by the following:

**E. Loss To A Pair Or Set**

1. In case of loss to a pair or set other than jewelry, we may elect to:

a. Repair or replace any part to restore the pair or set to its value before the loss; or

b. Pay the difference between actual cash value of the property before and after the loss.

2. Loss to a jewelry pair or set will be settled at replacement cost at the time of loss without deduction for depreciation.

Paragraph **H. Suit Against Us** is replaced by the following:

**H. Suit Against Us**

1. Except as provided in Paragraph **2.,** no suit or action can be brought against us unless there has been full compliance with all of the terms under Section **I** of this Policy. Action must be brought against us within two years and one day from the date the cause of action first accrues. A cause of action accrues on the date of the initial breach of our contractual duties as alleged in the action.

**EXHIBIT C**

2. With respect to suits brought in connection with claims for loss caused by windstorm or hail in the catastrophe area, as defined by the Texas Insurance Code:

No action can be brought against us unless there has been compliance with all of the terms of this Policy. The action must be brought before the earlier of the following:

a. Two years and one day from the date we accept or reject the claim; or

b. Three years and one day from the date of the loss that is the subject of the claim.

Paragraph **J. Loss Payment** is replaced by the following:

**J. Loss Payment**

We will adjust all losses with you. We will pay you unless some other person is named in the Policy or is legally entitled to payment.

If we notify you that we will pay your claim, or part of your claim, we must pay within five "business days" after we notify you. If payment of your claim or part of your claim requires the performance of an act by you, we must pay within five "business days" after the date you perform the act.

In all forms except **HO 00 04,** Paragraph **L. Mortgage Clause** is replaced by the following:

**L. Mortgage Clause (Without Contribution)**

1. We will pay for any covered loss of or damage to buildings or structures to the mortgagee shown in the Declarations as interests appear.

2. The mortgagee has the right to receive loss payment even if the mortgagee has started foreclosure or similar action on the building structure.

3. If we deny your claim because of your acts or because you have failed to comply with the terms of this Policy, the mortgagee has the right to receive loss payment if the mortgagee:

a. At our request, pays any premium due under this Policy, if you have failed to do so;

b. Submits a signed, sworn statement of loss within 91 days after receiving notice from us of your failure to do so; and

c. Has notified us of any changes in ownership, occupancy or substantial changes in risk known to the mortgagee.

All of the terms of this Policy will then apply directly to the mortgagee.

Failure of the mortgagee to comply with **3.a., 3.b.** or **3.c.** above shall void this Policy as to the interest of the mortgagee.

4. If we pay the mortgagee for any loss or damage and deny payment to you because of your acts or because you have failed to comply with the terms of this Policy:

a. The mortgagee's rights under the mortgage will be transferred to us to the extent of the amount we pay.

b. The mortgagee's right to recover the full amount of the mortgagee's claim will not be impaired.

At our option, we may pay the mortgagee the whole principal on the mortgage plus any accrued interest. In this event, your mortgage and note will be transferred to us and you will pay your remaining mortgage debt to us.

5. If this Policy is cancelled, we will give the mortgagee specifically named in the Declarations written notice of cancellation.

If we cancel the Policy, we will give the mortgagee the same number of days' notice of cancellation we give to you.

If you cancel the Policy, we will give the mortgagee notice of cancellation to be effective on the date stated in the notice. The date of cancellation cannot be before the 10th day after the date we mail the notice.

We will not give notice of cancellation to any successor or assignee of the mortgagee named in the Policy.

6. If the property described under Coverage **A** – Dwelling or Coverage **B** – Other Structures is foreclosed upon under the deed of trust, the mortgagee may cancel this Policy of insurance and will be entitled to any unearned premium from this Policy.

The mortgagee must credit any unearned premium against any deficiency owed by the borrower and return any unearned premium not so credited to the borrower. The unearned premium will be figured using the customary pro rata procedures.

7. If we elect not to renew this Policy, the mortgagee specifically named in the Declarations will be given 30 days' written notice of the nonrenewal.

(This condition does not apply to Form **HO 00 04.**)

Paragraph **R. Concealment Or Fraud** is replaced by the following:

**R. Concealment Or Fraud**

To the extent permitted by Texas Insurance Code sections 705.003 and 705.004, this policy is void for the "insured" who, whether before or after a loss, has:

**EXHIBIT C**

**1.** Intentionally concealed or misrepresented any material fact or circumstance;

**2.** Engaged in fraudulent conduct; or

**3.** Made material false statements;

relating to this insurance.

(This is Paragraph **Q.** in Form **HO 00 04.**)

The following conditions are added:

**Residential Community Property Clause**

This Policy, subject to all other terms and conditions, when covering residential community property, as defined by state law, shall remain in full force and effect as to the interest of each spouse covered, irrespective of divorce or change of ownership between the spouses unless excluded by endorsement attached to this Policy, until the expiration of the Policy or until cancelled in accordance with the terms and conditions of this Policy.

**Catastrophe Claims**

If a claim results from a weather-related catastrophe or a major natural disaster, each claim-handling deadline shown in **C.** Duties After Loss and **J.** Loss Payment is extended for an additional 15 days.

Catastrophe or Major Natural Disaster means a weather-related event which:

**1.** Is declared a disaster under the Texas Disaster Act of 1975; or

**2.** Is determined to be a catastrophe by the Texas Department of Insurance.

**SECTION II – EXCLUSIONS**

Paragraph **E.1. Expected Or Intended Injury** is replaced by the following:

**1. Expected Or Intended Injury**

"Bodily injury" or "property damage" which is expected or intended by an "insured".

However, this Exclusion **E.1.** does not apply to "bodily injury" or "property damage" resulting from the use of reasonable force by an "insured" to protect persons or property;

Paragraph **E.6. Communicable Disease** is replaced by the following:

**6. Communicable Disease**

"Bodily injury" or "property damage" which arises out of the transmission of sickness or disease by an "insured" through sexual contact;

Paragraph **E.7. Sexual Molestation, Corporal Punishment Or Physical Or Mental Abuse** is replaced by the following:

**7. Sexual Molestation, Corporal Punishment Or Physical Or Mental Abuse**

"Bodily injury" or "property damage" arising out of sexual molestation, corporal punishment or physical or mental abuse.

For the purposes of this exclusion, abuse means an act which is committed with the intent to cause harm; or

**SECTION II – CONDITIONS**

The following condition is added:

**K. Notice Of Offer To Settle Or Of Settlement Of Claim**

**1.** We will notify you in writing of any initial offer to settle a claim against you under this Section **II.** We will give you notice within 10 days after the date the offer is made.

**2.** We will notify you in writing of any settlement of a claim against you under this Section **II.** We will give you notice within 30 days after the date of the settlement.

**SECTIONS I AND II – CONDITIONS**

Paragraph **C. Cancellation** is replaced by the following:

**C. Cancellation**

**1.** You may cancel this Policy at any time by returning it to us or by letting us know in writing of the date cancellation is to take effect.

**2.** We may cancel this Policy at any time for the reasons stated in this condition by mailing you notice in writing of the date cancellation takes effect.

**a.** If this Policy has been in effect for less than 60 days and is not a renewal policy, we may not cancel this Policy unless:

**(1)** We identify a condition that:

**(a)** Creates an increased risk of hazard;

**(b)** Was not disclosed in the application for insurance coverage; and

**(c)** Is not the subject of a prior claim;

Includes copyrighted material of Insurance Services Office, Inc., with its permission

**EXHIBIT C**

(2) Before the effective date of the Policy, we do not accept a copy of a required inspection report that:

   (a) Was completed by an inspector licensed by the Texas Real Estate Commission or who is otherwise authorized to perform inspections; and

   (b) Is dated not earlier than the 90th day before the effective date of the Policy.

   An inspection report is deemed accepted unless we reject it before the 11th day after the date we receive it;

(3) You do not pay the premium or any portion of the premium due;

(4) The Texas Department of Insurance determines that continuation of the Policy would violate the Texas Insurance Code or any other laws governing the business of insurance in this state;

(5) You submit a fraudulent claim; or

(6) There is an increase in the hazard covered by this Policy that is within your control and that would produce an increase in the premium rate of this Policy.

The effective date of cancellation cannot be before:

(1) The 10th day after we mail notice if we cancel for reason (3), (4), (5) or (6) above.

(2) The 30th day after we mail notice if we cancel for any other reason.

b. If this Policy has been in effect 60 days or more, or at any time if it is a renewal policy, we may not cancel this Policy unless:

(1) You do not pay the premium or any portion of the premium due.

(2) The Texas Department of Insurance determines that continuation of the Policy would violate the Texas Insurance Code or any other laws governing the business of insurance in this state.

(3) You submit a fraudulent claim.

(4) There is an increase in the hazard covered by this Policy that is within your control and that would produce an increase in the premium rate of this Policy.

The effective date of cancellation cannot be before the 10th day after we mail the notice. Our notice of cancellation must state the reason for cancellation.

3. When this Policy is cancelled, we will send you any refund due not later than the 15th "business day" after the effective date of cancellation. The premium for the period from the date of cancellation to the expiration date will be refunded pro rata.

4. If we cancel, our notice to you will state that if this refund is not included with the notice, it will be returned on demand or not later than the 15th "business day" after the date of cancellation.

5. We may not cancel this Policy solely because you are an elected official.

Paragraph **D. Nonrenewal** is replaced by the following:

**D. Refusal To Renew**

1. We may not refuse to renew this Policy because of claims for losses resulting from natural causes.

2. We may not refuse to renew this Policy solely because you are an elected official.

3. We may refuse to renew this Policy if you have filed three or more claims under the Policy in any three-year period that do not result from natural causes.

   If you have filed two claims in a period of less than three years, we may notify you in writing that if you file a third claim during the three-year period, we may refuse to renew this Policy by providing you proper notice of our refusal to renew as provided in **4.** below. If we do not notify you after the second claim, we may not refuse to renew this Policy because of losses.

   A claim does not include a claim that is filed but is not paid or payable under the Policy.

4. If we refuse to renew this Policy, we must deliver to you, or mail to you at your mailing address shown in the Declarations and any mortgagee named in the Declarations, written notice of our refusal to renew not later than the 30th day before the date on which this Policy expires. Proof of mailing will be sufficient proof of notice. If we fail to give you proper notice of our decision not to renew, you may require us to renew the Policy.

All other provisions of this Policy apply.

 Includes copyrighted material of Insurance Services Office, Inc., with its permission.

EXHIBIT C

# EXHIBIT B

EXHIBIT C

## PLAINTIFFS' FIRST REQUEST FOR PRODUCTION

Pursuant to Texas Rule of Civil Procedure 196, Plaintiffs' hereby serve upon you Plaintiffs' First Request for Production. Defendants are requested to respond to these Requests for Production within fifty (50) days of service of this request at the offices of Plaintiffs' counsel or as otherwise agreed in advance by the parties as provided by the Texas Rules of Civil Procedure.

## TABLE OF DEFINITIONS/ABBREVIATIONS

The following definitions or abbreviations of various words and phrases are contained in the following Admissions. The Plaintiffs provide the following definitions and abbreviations for the purpose of clarifying the meaning of various words and phrases contained herein, in order to expedite discovery and to help the Defendants fully and accurately understand the objectives of the Plaintiffs' discovery efforts.

1. The "**Claim**" means the insurance claim made the basis of the breach of contract claim You have made against Defendant in this lawsuit;

2. "**Communication**" means any oral, written, printed, documentary, or electronic transfer of information. "Statement" means:

   a. Any written or graphic statement made, recorded, signed, or otherwise adopted or approved by the person making it; and

   b. Any stenographic, mechanical, electrical or other type of recording, or any transcription thereof which is a substantially verbatim recital in whole or part of an oral statement by the person making it and recorded to memorialize either the statement and/or the underlying event.

3. "**Concerning**" or "**concerns**" means, in whole or in part, directly, or indirectly referring to relating to, connected with, commenting on, responding to, showing, describing, analyzing, reflecting, or constituting.

4. "**Clear Blue**" refers to Defendant Clear Blue Insurance Company;

5. "**Date of Loss**" refers to July 26, 2018;

6. "**Identify**" or "**Identification**":

   a. When used in reference to a person, "Identify" or "Identification" means to state: a) his/her full name; b) present or last known residence address; c) present or last

**EXHIBIT C**

known business address and telephone number; and d) social security number and driver's license number to the extent available.

b.   When used in reference to a public or private corporation, governmental entity, partnership or association, "identify" or "identification" means to state its full name, present or last known business address or operating address, and the name of the person primarily responsible for its activities and that person's title.

c.   When used in reference to a document, "identify" or "identification" shall include a statement of the following:

    i.   the title, heading, or caption, if any, of every such document;

    ii.   whether the document exists;

    iii.   all attachments to the document;

    iv.   the contents of the document;

    v.   the identifying number(s), letter(s), or combination thereof, if any; and the significance or meaning of such number(s), letter(s), or combination thereof, if necessary to an understanding of the document and evaluation of any claim of protection from discovery;

    vi.   the date appearing on such document; if no date appears thereon, the answer shall so state and whenever possible shall give the date or approximate date on which such document was prepared;

    vii.   the number of pages and the general nature or description of such document (i.e., whether it is a letter, memorandum, minutes of a meeting, etc.), with sufficient particularity so as to enable such document to be precisely identified;

    viii.   the name and capacity of the person who authorized or signed such document; if it was not signed, the answer shall so state and shall give the name of the person or persons who prepared it;

    ix.   the name and capacity of the person to whom such document was addressed and the name and capacity of such person, other than such addressee, to whom such document, or a copy thereof, was sent; and

    x.   the physical location of the document and the identity of its custodian or custodians.

7.   "**NARS**" refers to Defendant North American Risk Services;

2

**EXHIBIT C**

8. The "**Lawsuit**" shall mean the suit at law styled and titled *Roozbeth Sharif and Christina Sharif v. Clear Blue Insurance Company, Swyfft, LLC, and North American Risk Services*.

9. **"Person"** means any natural person, corporation, firm, association, partnership, joint venture, proprietorship, governmental body, or any other organization, business, or legal entity, and all predecessors or successors in interest.

10. **"Plaintiffs"** - refers to Roozbeh Sharif and Christina Sharif;

11. **"Plaintiffs' Claim"** refers to Claim No. HMCBS18080317;

12. **"Clear Blue Policy"** means the Swyfft Home Owners Insurance Policy No. AL01-052876-00 means the insurance policy that is the basis of claims made against Defendants in this lawsuit.

13. **"Possession, custody, or control"** of an item means that the person either has physical possession of the item or has a right to possession that is equal or superior to the person who has physical possession of the item.

14. The term "**Property**" means real property located at and more commonly known as 1801 Sunset Blvd., Houston, Texas 77005;

15. **"Relating to"** and **"relates to"** means, without limitation, embodying, mentioning, or concerning, directly or indirectly, the subject matter identified in the request.

16. "**Sharifs**" This term shall refer Roozbeh Sharif and Christina Sharif;

17. "**Swyfft**" refers to Defendant Swyfft, LLC;

18. For the purpose of this instrument the term "**writing**" or "**writings**" or "**document**" or "**documents**" shall include, but not be limited to all handwritten, stenographic, typewritten, electronic or magnetic data (produce on 3.5 A ASCII microdisks) or printed writings and papers of every kind, kept, maintained, or received by the Plaintiff or by Plaintiff's attorney, including, but not limited to contracts, records, e-mails, calendar or diary entries, pamphlets, notes, charts, tabulations, records of meetings (including tape recordings and transcriptions thereof), conferences and telephone or other conversations or other communications, ledgers, financial statements, photostats, microfilms, tape or disc recordings, software programs, including reproductions of documents which are not identical duplicates of the originals and also including any reproductions or copies of documents for which the originals are not in the possession, custody, or control of the Plaintiff.

3

**EXHIBIT C**

19. "**You**" or "**your**" or "**yours**" - refers to Defendants North American Risk Services, Clear Blue Insurance Company, and Swyfft, LLC, and Defendant's legal beneficiaries, representatives or assigns, acting or purporting to act for or on behalf of Defendants, whether authorized to do so or not;

20. The use of any particular gender or the use of the plural or singular of any words is intended to include the appropriate gender or number as the text and scope of any particular discovery request may otherwise encompass.

## PLAINTIFFS' REQUEST FOR PRODUCTION

**Request for Production No. 1:**  All documents signed by Plaintiffs.

**RESPONSE:**

**Request for Production No. 2:** Any insurance application filed by Plaintiffs and all documents relating to the application.

**RESPONSE:**

**Request for Production No. 3:** A complete copy of the Plaintiffs' insurance policy at issue in this lawsuit including all prior and subsequent policies.

**RESPONSE:**

**Request for Production No. 4:** A complete copy of all other insuring agreements relating to Plaintiffs.

**RESPONSE:**

**Request for Production No. 5:** Any other agreements between Plaintiffs and Defendants and all the documents relating to any agreement.

**RESPONSE:**

**Request for Production No. 6:** Your entire "underwriting" file on Plaintiffs' policy at issue in this lawsuit.

**RESPONSE:**

**EXHIBIT C**

**Request for Production No. 7:** All underwriting guidelines and related documents relating to Plaintiffs' insurance policy.

<u>RESPONSE:</u>

**Request for Production No. 8:** Any statements given by Plaintiffs to NARS, Clear Blue, and/or Swyfft.

<u>RESPONSE:</u>

**Request for Production No. 9:** Copies of any statements you have received from any person concerning the subject matter of this lawsuit.

<u>RESPONSE:</u>

**Request for Production No. 10:** For any testifying expert and any consulting expert whose mental impressions or opinions have been reviewed by a testifying expert, all documents, tangible things, reports, models, or data compilations that have been provided to, reviewed by or for the expert in anticipation of a testifying expert's testimony.

<u>RESPONSE:</u>

**Request for Production No. 11:** For any testifying expert and any consulting expert whose mental impressions or opinions have been reviewed by a testifying expert, a copy of the expert's current resume.

<u>RESPONSE:</u>

**Request for Production No. 12:** For any testifying expert and any consulting expert whose mental impressions or opinions have been reviewed by a testifying expert, a copy of the expert's bibliography.

<u>RESPONSE:</u>

**Request for Production No. 13:** Your entire claim file on Plaintiffs' Policy at issue in this lawsuit, including all documents relating to Plaintiffs' claim.

<u>RESPONSE:</u>

**EXHIBIT C**

**Request for Production No. 14:** All documents relating to any initial determination, temporary determination, tentative determination, or final determination, as to whether or not any claim by Plaintiffs was payable or not payable.

<u>**RESPONSE:**</u>

**Request for Production No. 15:** Your entire claim files on any other policy that you issued to Plaintiffs, including all documents relating to Plaintiffs' claims.

<u>**RESPONSE:**</u>

**Request for Production No. 16:** All documents mentioning, summarizing, containing, describing, or otherwise relating to any contacts between you and Plaintiffs.

<u>**RESPONSE:**</u>

**Request for Production No. 17:** Copies of any personal notes, documents, or memoranda relating to Plaintiffs.

<u>**RESPONSE:**</u>

**Request for Production No. 18:** All correspondence between you and Plaintiffs.

<u>**RESPONSE:**</u>

**Request for Production No. 19:** All correspondence between you and anyone else relating to Plaintiffs, Plaintiffs' claims, or this lawsuit.

<u>**RESPONSE:**</u>

**Request for Production No. 20:** All records of every telephone conversation with or regarding Plaintiffs.

<u>**RESPONSE:**</u>

**Request for Production No. 21:** All documents submitted by Plaintiffs in support of their claim.

<u>**RESPONSE:**</u>

**EXHIBIT C**

**Request for Production No. 22:**  All documents received from anyone else regarding Plaintiffs' claim.

<u>RESPONSE:</u>

**Request for Production No. 23:**  All documents setting forth any opinion of your counsel regarding the interpretation and application of any exclusion, limitation, or other policy provision to Plaintiffs' claim, to the extent that you relied on any such document in making your decision to deny Plaintiffs' claim.

<u>RESPONSE:</u>

**Request for Production No. 24:**  All documents that you contend satisfied your obligations under Tex. Ins. Code article 21.55 in this case.

<u>RESPONSE:</u>

**Request for Production No. 25:**  All documents that you contend satisfied your duty to promptly respond to pertinent communications from Plaintiffs.

<u>RESPONSE:</u>

**Request for Production No. 26:**  All documents that you contend satisfied your duty to attempt in good faith to effectuate a prompt, fair, and equitable settlement of Plaintiffs' claim.

<u>RESPONSE:</u>

**Request for Production No. 27:**  All documents that you contend satisfied your duty to provide promptly to Plaintiffs a reasonable explanation of the basis in their insurance policy in relation to the facts or applicable law for denial of his claim or for the offer of a compromise settlement.

<u>RESPONSE:</u>

**Request for Production No. 28:**  All documents that you contend satisfied your duty to conduct a reasonable investigation of Plaintiffs' claim based upon all available information.

<u>RESPONSE:</u>

**EXHIBIT C**

**Request for Production No. 29:** All other documents, reports, or memoranda received, reviewed, relied on by you, or otherwise related to your handling of Plaintiffs' claim.

<u>**RESPONSE:**</u>

**Request for Production No. 30:** All documents relating to company guidelines or policies that serve as criteria for evaluating whether claims are covered or excluded by any policy provisions that you contend apply to Plaintiffs' claim.

<u>**RESPONSE:**</u>

**Request for Production No. 31:** A copy of your current claims handling policies and procedures and the version in effect at the time Plaintiffs' claim was denied.

<u>**RESPONSE:**</u>

**Request for Production No. 32:**  Copies of all corporate minutes relating in any way to the supervision or handling of claims made pursuant to policies issued by you.

<u>**RESPONSE:**</u>

**Request for Production No. 33:**  Copies of all corporate resolutions relating in any way to the supervision or handling of claims made pursuant to policies issued by you.

<u>**RESPONSE:**</u>

**Request for Production No. 34:** All documents that you contend satisfied your duty to adopt and implement reasonable standards for prompt investigation of claims like Plaintiffs'.

<u>**RESPONSE:**</u>

**Request for Production No. 35:** All documents showing that Plaintiffs' claim *was* caused by a condition excluded under their policy.

<u>**RESPONSE:**</u>

**Request for Production No. 36:**  All documents showing that Plaintiffs' claim *was not* caused by a condition excluded under their policy.

<u>**RESPONSE:**</u>

8

**EXHIBIT C**

**Request for Production No. 37:** Any written explanation of policy coverage pertaining to policies identical or similar to the policy issued by you to Plaintiffs.

<u>**RESPONSE:**</u>

**Request for Production No. 38:**  Any documents submitted to Plaintiffs or other similar insureds describing their coverage or describing the services provided by you.

<u>**RESPONSE:**</u>

**Request for Production No. 39:** All advertisements disseminated by you in the State of Texas within the past five years.

<u>**RESPONSE:**</u>

**Request for Production No. 40:** All documents that you contend contradict the amount of Plaintiffs' claim.

<u>**RESPONSE:**</u>

**Request for Production No. 41:**  Any complaint list, complaint journal, or similar document for the most recent five year period. This request seeks any list kept in the form required by the Texas Department of Insurance pursuant to 28 Tex. Admin. Code § 21.203(6), and any similar documents.

<u>**RESPONSE:**</u>

**Request for Production No. 42:**  All claims and underwriting files for each claim by another claimant whose claim you denied in the past five years for any reason that you contend supports your denial of Plaintiffs' claim.

<u>**RESPONSE:**</u>

**Request for Production No. 43:** Your claims denied journal and any similar documents for the most recent five years.

<u>**RESPONSE:**</u>

**EXHIBIT C**

**Request for Production No. 44:** All demand or complaint letters you have received in the past five years from any person after you denied their claim for any reason that you contend supports your denial of Plaintiffs' claim.

<u>RESPONSE:</u>

**Request for Production No. 45:** Copies of all petitions and complaints filed in any lawsuits in the past five years to which you are, or have been, a party in any capacity relating to disputes involving allegations of "bad faith," deceptive trade practices, unconscionable conduct, unfair insurance practices, violations of article 21.21 of the Texas Insurance Code, breach of the duty of good faith and fair dealing, any violation of any statute, rule, or regulation regulating the business of insurance, or any similar allegations, relating to a policy similar to Plaintiffs' policy and any claim you denied for any reason you contend applies to Plaintiffs' claim.

<u>RESPONSE:</u>

**Request for Production No. 46:** Your most recent annual statement as filed with the Texas Department of Insurance.

<u>RESPONSE:</u>

**Request for Production No. 47:** All documents showing premiums paid by Plaintiffs for the policy.

<u>RESPONSE:</u>

**Request for Production No. 48:** All documents relating to the amount of any reserve you have established, set aside, or reported for Plaintiffs' claims.

<u>RESPONSE:</u>

**Request for Production No. 49:** Documents showing your net worth for the past five years.

<u>RESPONSE:</u>

**Request for Production No. 50:** Any insurance agreement, indemnity agreement, or other document by which any person or entity may be liable to satisfy all or part of any judgment that may be rendered against you in this case.

<u>RESPONSE:</u>

**EXHIBIT C**

**Request for Production No. 51:** Any settlement agreement or similar document reflecting any agreement, deal, or understanding between you and any other person or entity with respect to this case.

<u>**RESPONSE:**</u>

**Request for Production No. 52:** All documents referred to or relied on in your interrogatory answers.

<u>**RESPONSE:**</u>

**Request for Production No. 53:** Any audiotape and/or videotape recording of anything relating to any issue, claim, fact, or defense in this lawsuit.

<u>**RESPONSE:**</u>

**Request for Production No. 54:** All photographs that relate to Plaintiffs or any claim, defense, or issue in this case.

<u>**RESPONSE:**</u>

**Request for Production No. 55:** All tangible things that relate to any claim or defense in this case.

<u>**RESPONSE:**</u>

**Request for Production No. 56:** All employment agreements that you have ever had with your agent in this case.

<u>**RESPONSE:**</u>

**Request for Production No. 57:** All documents relating to or showing commissions earned by your agent on policies sold to Plaintiffs.

<u>**RESPONSE:**</u>

**Request for Production No. 58:** All documents reflecting the total amount of policies sold by your agent, Khansari Agency, the premiums collected on such policies, and the commissions paid by on such policies.

<u>**RESPONSE:**</u>

11

**EXHIBIT C**

**Request for Production No. 59:**  All manuals, training materials, and similar documents used in training, overseeing, or supervising your claims handling personnel and your agents employed in selling policies.

<u>RESPONSE:</u>


**Request for Production No. 60:**  All documents defining or relating to the authority, or limiting the authority, of Defendants to make representations or other statements related to coverage or any other provision of the policy at issue in this lawsuit.

<u>RESPONSE:</u>


**Request for Production No. 61:** All correspondence between the Texas Department of Insurance and you regarding proposed or actual disciplinary measures involving the Sharifs, the Sunset Property, the Clear Blue Policy, or any of the facts and circumstances forming the basis of the Lawsuit.

<u>RESPONSE:</u>


**Request for Production No. 62:**  All documents relating to any license suspension or revocation, or other disciplinary action taken with respect to the Sharifs, the Sunset Property, the Clear Blue Policy, or any of the facts and circumstances forming the basis of the Lawsuit by you or by any regulatory agency.

<u>RESPONSE:</u>

**EXHIBIT C**

# EXHIBIT C

EXHIBIT C

## PLAINTIFFS' FIRST SET OF INTERROGATORIES TO ALL DEFENDANTS

Pursuant to Texas Rule of Civil Procedure 197, Plaintiffs' hereby serve upon you Plaintiffs' First Set of Interrogatories. Defendants are requested to answer these Interrogatories within fifty (50) days of service of this request at the offices of Plaintiffs' counsel or as otherwise agreed in advance by the parties as provided by the Texas Rules of Civil Procedure.

## TABLE OF DEFINITIONS/ABBREVIATIONS

A.      The following interrogatories are to be answered separately and fully in writing by furnishing all information in your possession, custody, or control. Where knowledge or information or possession or control by Defendants are requested or inquired of, such request or inquiry includes knowledge, information, possession or control of or by your agents, representatives and attorneys.

B.      If you cannot answer a question in full after exercising due diligence to secure the information, so state in your answer and, to the fullest extent possible, answer or respond stating whatever information or knowledge you do have and specify the reason for your inability to answer completely. If documents or records exist that are not available to you, state where the documents or records are located, to the best of your knowledge, including the name, title and address of their present custodian.

C.      Where any party, person or entity is described or defined below, such party, person, or entity is defined to include such party, person or entity's predecessors, successors, assigns, legal beneficiaries, affiliates, divisions, subsidiaries, parent companies or organizations, partners, joint venturers or enterprisers, and any director, officer, agent, employee, representative, person, firm, company or corporation acting or purporting to act on behalf of such party, person or entity, whether now or at any time relevant to the response to the attached discovery requests acting and whether authorized to do so or not.

D.      For any interrogatory or any part of an interrogatory which you refuse to answer under a claim of privilege or you otherwise claim as protected from discovery, you must submit a log, which contains the following information:

i.      Nature of the privilege asserted;
ii.     Person asserting the privilege; and
iii.    Describe the nature of the documents, communications or tangible things not produced or disclosed sufficient to enable Gulf Coast Boiler to assess Plaintiff's claim, setting forth at least the following:
a.      For documents:
    i.      Author and/or signatory of document
    ii.     Date of the document;
    iii.    Identity of the addressee and all others who have received or read the document;
    iv.     Identity of those who have knowledge of the matters contained in the document; and

**EXHIBIT C**

        v.      Whether the document(s) withheld has any document(s) or attachment(s) appended to, included with, attached to, incorporated by or referred to in it/them and whether any of these documents or attachments have otherwise been produced in response to any discovery requests.

b.    For communications:

      i.      Date(s) of communication;

     ii.     Identify participants in communication;

   iii.     Identity of all others to whom the subject matter of the communication has been disclosed; and

   iv.     Nature and subject matter of communication.

E.      The following definitions or abbreviations of various words and phrases are contained in the following Interrogatories. The Plaintiffs provide the following definitions and abbreviations for the purpose of clarifying the meaning of various words and phrases contained herein, in order to expedite discovery and to help the Defendants fully and accurately understand the objectives of the Plaintiffs' discovery efforts.

1.  "**Communication**" means any oral, written, printed, documentary, or electronic transfer of information.  "Statement" means:

    a.  Any written or graphic statement made, recorded, signed, or otherwise adopted or approved by the person making it; and

    b.  Any stenographic, mechanical, electrical or other type of recording, or any transcription thereof which is a substantially verbatim recital in whole or part of an oral statement by the person making it and recorded to memorialize either the statement and/or the underlying event.

2.  **"Concerning" or "concerns"** means, in whole or in part, directly, or indirectly referring to relating to, connected with, commenting on, responding to, showing, describing, analyzing, reflecting, or constituting.

3.  "**Clear Blue**" refers to Defendant Clear Blue Insurance Company;

4.  "**Date of Loss**" refers to July 26, 2018;

5.  "**Identify**" or "**Identification**":

    a.  When used in reference to a person, "Identify" or "Identification" means to state: a) his/her full name; b) present or last known residence address; c) present or last known business address and telephone number; and d) social security number and driver's license number to the extent available.

    b.  When used in reference to a public or private corporation, governmental entity, partnership or association, "identify" or "identification" means to state its full name, present or last known business address or operating address, and the name of the person primarily responsible for its activities and that person's title.

**EXHIBIT C**

   c.  When used in reference to a document, "identify" or "identification" shall include a statement of the following:

      i.  the title, heading, or caption, if any, of every such document;

      ii.  whether the document exists;

      iii.  all attachments to the document;

      iv.  the contents of the document;

      v.  the identifying number(s), letter(s), or combination thereof, if any; and the significance or meaning of such number(s), letter(s), or combination thereof, if necessary to an understanding of the document and evaluation of any claim of protection from discovery;

      vi.  the date appearing on such document; if no date appears thereon, the answer shall so state and whenever possible shall give the date or approximate date on which such document was prepared;

      vii.  the number of pages and the general nature or description of such document (i.e., whether it is a letter, memorandum, minutes of a meeting, etc.), with sufficient particularity so as to enable such document to be precisely identified;

      viii.  the name and capacity of the person who authorized or signed such document; if it was not signed, the answer shall so state and shall give the name of the person or persons who prepared it;

      ix.  the name and capacity of the person to whom such document was addressed and the name and capacity of such person, other than such addressee, to whom such document, or a copy thereof, was sent; and

      x.  the physical location of the document and the identity of its custodian or custodians.

6.  "**NARS**" refers to Defendant North American Risk Services;

7.  The "**Lawsuit**" shall mean the suit at law styled and titled *Roozbeth Sharif and Christina Sharif v. Clear Blue Insurance Company, Swyfft, LLC, and North American Risk Services.*

3

**EXHIBIT C**

8. **"Person"** means any natural person, corporation, firm, association, partnership, joint venture, proprietorship, governmental body, or any other organization, business, or legal entity, and all predecessors or successors in interest.

9. **"Plaintiffs"** - refers to Roozbeh Sharif and Christina Sharif;

10. **"Plaintiffs' Claim"** refers to Claim No. HMCBS18080317;

11. **"Policy"** means the Swyfft Home Owners Insurance Policy No. AL01-052876-00 which provided insurance to Roozbeh Sharif and Christina Seguin for the Property located at 1801 Sunset Blvd., Houston, Texas 77005 with a policy period of May 10, 2018 through May 10, 2019.

12. **"Possession, custody, or control"** of an item means that the person either has physical possession of the item or has a right to possession that is equal or superior to the person who has physical possession of the item.

13. The term **"Property"** means real property located at and more commonly known as 1801 Sunset Blvd., Houston, Texas 77005;

14. **"Relating to"** and **"relates to"** means, without limitation, embodying, mentioning, or concerning, directly or indirectly, the subject matter identified in the request.

15. **"Sharifs"** This term shall refer Roozbeh Sharif and Christina Sharif;

16. "**Swyfft**" refers to Defendant Swyfft, LLC;

17. For the purpose of this instrument the term "**writing**" or "**writings**" or "**document**" or "**documents**" shall include, but not be limited to all handwritten, stenographic, typewritten, electronic or magnetic data (produce on 3.5 A ASCII microdisks) or printed writings and papers of every kind, kept, maintained, or received by the Plaintiff or by Plaintiff's attorney, including, but not limited to contracts, records, e-mails, calendar or diary entries, pamphlets, notes, charts, tabulations, records of meetings (including tape recordings and transcriptions thereof), conferences and telephone or other conversations or other communications, ledgers, financial statements, photostats, microfilms, tape or disc recordings, software programs, including reproductions of documents which are not identical duplicates of the originals and also including any reproductions or copies of documents for which the originals are not in the possession, custody, or control of the Plaintiff.

18. "**You**" or "**your**" or "**yours**" - refers to Defendants North American Risk Services, Clear Blue Insurance Company, and Swyfft, LLC, and Defendant's legal beneficiaries, representatives or assigns, acting or purporting to act for or on behalf of Defendants, whether authorized to do so or not;

4

**EXHIBIT C**

19. The use of any particular gender or the use of the plural or singular of any words is intended to include the appropriate gender or number as the text and scope of any particular discovery request may otherwise encompass.

## INTERROGATORIES

### INTERROGATORY NO. 1:

Identify each person who provided information or participated in answering these interrogatories, and state which interrogatories each person provided information for or participated in answering.

**ANSWER:**

### INTERROGATORY NO. 2:

Identify the person who sold the policy in question to Plaintiffs, and state the nature of your relationship to that person.

**ANSWER:**

### INTERROGATORY NO. 3:

Identify every person who participated to any degree in the investigation and denial of the claim involved in this case, describe the involvement of each person identified, and state the dates of each investigation.

**ANSWER:**

### INTERROGATORY NO. 4:

Describe in detail all conversations, correspondence, and other contacts between you and Plaintiffs relating to the transactions and claims at issue in this case. For each contact: (a) provide the date of the contact; (b) identify all participants and witnesses; (c) describe fully what was said or done; and (d) state what action was taken as a result.

**ANSWER:**

5

**EXHIBIT C**

**INTERROGATORY NO. 5:**

Describe in detail your investigation concerning Plaintiff's claim, and include in your answer each activity that you contend satisfied the requirements of Tex. Ins. Code article 21.55.

**ANSWER:**

**INTERROGATORY NO. 6:**

For each activity that you contend satisfied the requirements of Tex. Ins. Code article 21.55, regarding "Prompt Payment of Claims," state the following:

> (a)  the date you received notice of any claim, how you received notice, and the identity of any document or person who gave you notice;

> (b)  the date you acknowledged receipt of the claim, the means and content of the acknowledgment, and the identity of any document or person who acknowledged receipt;

> (c)  the date you commenced any investigation of the claim, how you commenced your investigation, the identity of any person who commenced the investigation, and the identity of any document showing the commencement of your investigation;

> (d)  the date of each request from the claimant for all items, statements, and forms you reasonably believed, at the time, would be required from the claimant, the identity of the document setting out the request, and the identity of the person making the request;

> (e)  the date you received all items, statements, and forms required by you in order to secure final proof of loss, and what occurred on that date;

> (f)  the date and identity of any document notifying the claimant of your acceptance or rejection of the claim and the reasons for your rejection;

> (g)  the date and identity of any notice to the claimant stating any reasons you needed additional time;

> (h)  the date and amount of any payment by you, and the identity of any document relating to that payment.

**ANSWER:**

**INTERROGATORY NO. 7:**

If you contend that Plaintiffs have not given you any information that is necessary for you to properly evaluate and pay their claim, please identify and describe all further information that you need.

**ANSWER:**

**EXHIBIT C**

**INTERROGATORY NO. 8:**

Identify every person who has provided any information to you concerning Plaintiffs or their claim, whether or not you considered that information in making your decision regarding Plaintiffs' claim; describe the information provided by each person; and state whether you considered the information in making or reviewing your decision concerning Plaintiffs' claim.

**ANSWER:**


**INTERROGATORY NO. 9:**

Identify each document, report, letter, or other source of information, and any tangible things that you considered or relied on concerning Plaintiffs' claim.

**ANSWER:**


**INTERROGATORY NO. 10:**

Explain every reason for your decision concerning Plaintiff's claim. Your answer should provide "a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement[.]" 28 Tex. Admin. Code § 21.203. To the extent that you rely on a specific policy provision, please identify the policy provision and set forth the policy language verbatim in your answer.

**ANSWER:**


**INTERROGATORY NO. 11:**

Identify each element of Plaintiffs' claim that you contend is not covered by the policy, and explain why each is not covered.

**ANSWER:**


**INTERROGATORY NO. 12:**

Identify each element of Plaintiffs' claim that you agree is covered by the policy, and explain why each is covered.

**ANSWER:**


7

**EXHIBIT C**

**INTERROGATORY NO. 13:**

If you dispute the amount of Plaintiffs' claim, the proposed work, the methods of repair, the materials submitted in support of their claim, or any other element of their claim – apart from your contention that the claim is not covered – then identify each specific point of disagreement, explain the basis for your disagreement, set out what you contend is proper instead, and describe the factual basis for your contention

**ANSWER:**

**INTERROGATORY NO. 14:**

Identify each person or entity that you contend may be responsible for any part of Plaintiffs' damages alleged in this lawsuit, state the reason that you contend the person or entity may be liable, and state the factual basis for your contention.

**ANSWER:**

**INTERROGATORY NO. 15:**

For the most recent five (5) years, please provide the following information:

     (a)     the total number of written claims filed, including the original amount filed for by the insured and the classification by line of insurance of each individual written claim;

     (b)     the total number of written claim denied;

     (c)     the total number of written claims settled, including the original amount filed for by the insured, the settled amount, and the classification of line of insurance of each individual settled claim;

     (d)     the total number of written claims for which lawsuits were instituted against you, including the original amount filed for by the insured, the amount of final adjudication, the reason for the lawsuit, and the classification by line of insurance of each individual written claim;

     (e)     the total number of complaints, their classification by line of insurance, the nature of each complaint, the disposition of these complaints, and the time it took to process each complaint.

**ANSWER:**

**INTERROGATORY NO. 16:**

Identify every person whose claim you denied within the past five years for any reason that you contend applies to Plaintiffs' claim.

**ANSWER:**

8

**EXHIBIT C**

**INTERROGATORY NO. 17:**

Identify every person who has complained to you or to the Texas Department of Insurance, within the past five years, about your failure to pay a claim or your delay in payment of a claim under any policy similar to Plaintiffs', if your decision was based on any reason you contend applies to Plaintiff's claim.

**ANSWER:**

**INTERROGATORY NO. 18:**

For each lawsuit filed against you in the past five (5) years involving a claim you denied for any reason you contend supports your denial of Plaintiffs' claim, and involving an allegation of "bad faith," deceptive trade practices, unfair practices in the business of insurance, unconscionable action or courses of action, violations of article 21.21 of the Texas Insurance Code, breach of the duty of good faith and fair dealing, any violation of any statute, rule, or regulation relating to the business of insurance, or any similar claim, state the following:

(a) the style, cause number, court, county, and state of the lawsuit;

(b) the identity of the person(s) bringing suit against you;

(c) the identity of the attorney representing the person(s) who brought suit against you;

(d) the nature of the claim against you; and

(e) the resolution, if any, to such lawsuit (*e.g.*, the type of judgment rendered, the amount of any judgment, or the amount of any settlement.)

**ANSWER:**

**INTERROGATORY NO. 19:**

Please state the total amount of premiums paid by the Plaintiffs for their policy.

**ANSWER:**

**INTERROGATORY NO. 20:**

State the amount of loss reserves, if any, that you have set aside regarding any of the claims made in this lawsuit.

**ANSWER:**

9

**EXHIBIT C**

**INTERROGATORY NO. 21:**

 State your net worth for the most recent five (5) years.

**ANSWER:**

**INTERROGATORY NO. 22:**

Have you entered into any agreement, "deal," or understanding, whether oral or written, with any person or entity regarding any settlement of any matter, allocation of any liability, or payment of any amount with respect to this case? If so: (a) state the terms of any such agreement; (b) identify the parties to the agreement; and (c) identify all documents relating to or reflecting any such agreement.

**ANSWER:**

10

**EXHIBIT C**